# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

## CHARLESTON DIVISION

ROBERT B. JOSEPH,      )
                       )
        Petitioner,     )
                       )      **CIVIL ACTION NO. 2:13-28391**
v.                     )
                       )
MARVIN C. PLUMLEY, Warden,   )
                       )
        Respondent.    )

## AMENDED PROPOSED FINDINGS AND RECOMMENDATION

Pending before the Court is Respondent's Motion for Summary Judgment (Document No. 15), filed on September 21, 2015. Petitioner filed his Response in Opposition on November 18, 2015. (Document No. 22.) Having thoroughly examined the record in this case, the undersigned respectfully recommends that the District Court grant Respondent's Motion for Summary Judgment.

## PROCEDURAL HISTORY

**A.    Criminal Action No. 01-F-291:**

Following a jury trial, Petitioner was convicted on May 3, 2002, of first degree murder with a recommendation of mercy. State v. Joseph, Case No. 01-F-291 (Cir. Ct. Kanawha Co. June 6, 2002); (Document No. 15-5, p. 2.) On June 6, 2002, the Circuit Court sentenced Petitioner to life with mercy. (Id.); State v. Joseph, 214 W.Va. 525, 590 S.E.2d 718 (2003).[1] Petitioner filed his Petition for Appeal with the West Virginia Supreme Court of Appeals arguing that the Circuit Court erred in excluding testimony offered by the defense to show that Petitioner suffered from a

---

[1]  Former Kanawha County Circuit Court Judge Irene C. Berger presided over Petitioner's underlying criminal proceedings.

diminished capacity that prevented him from forming the requisite mental state for the commission of first or second degree murder. (Document No. 15-5, p. 2.) By Opinion entered on December 10, 2003, the West Virginia Supreme Court reversed and remanded after determining that the proffered expert opinion that Petitioner was unable, due to mental defect, to formulate intent, malice or to premediate under circumstance of charged indictment was sufficient evidence to allow the expert to testify before the jury regarding the diminished capacity defense. (Id.) Following remand, the Circuit Court entered a scheduling order establishing a timeframe for the parties to exchange supplemental expert reports and other related discovery prior to Petitioner's second trial. (Document No. 15-5, p. 3.) Pursuant to the ruling and directives of the West Virginia Supreme Court, the Circuit Court ruled that Petitioner could present the testimony of his three previously disclosed expert witnesses on the issue of diminished capacity. (Id.) Following a three-day jury trial, Petitioner was convicted on August 12, 2004, of first degree murder with a recommendation of mercy. (Id., pp. 3 - 4.) On September 20, 2004, the Circuit Court sentenced Petitioner to life with mercy. (Id., p. 4.)

Petitioner filed a Petition for Appeal with the West Virginia Supreme Court asserting errors involving the examination of Petitioner by Dr. Granacher and the cross examination of Dr. Granacher. (Id.) The West Virginia Supreme Court refused Petitioner's Petition for Appeal on October 26, 2006. (Id.); State v. Joseph, Case No. 050894 (W.Va. Oct. 26, 2006).

**2.      State *Habeas* Proceedings:**

On December 13, 2006, Petitioner, acting *pro se*, filed his Petition for Writ of *Habeas Corpus* in the Circuit Court of Kanawha County. Joseph v. McBride, Case No. 06-MISC-479 (Cir. Ct. Kanawha Co.); (Document No. 15-5, p. 4.) Subsequently, the Circuit Court summarily denied Petitioner's *habeas* Petition. (Id.) Petitioner filed an appeal concerning the Circuit Court's denial

of his *habeas* Petition. (<u>Id.</u>) The West Virginia Supreme reversed the Circuit Court's decision and remanded with directions that the Circuit Court appoint counsel, conduct an omnibus hearing, and issue a final decision. (<u>Id.</u>) On remand, the Circuit Court appointed Matthew A. Victor as counsel. (<u>Id.</u>) On September 9, 2009, Petitioner, by counsel, filed an Amended *Habeas* Petition asserting the following grounds for *habeas* relief:

1. The trial court erred in preventing the Petitioner from being examined by his expert;

2. The trial court violated the Petitioner's right to a fair trial by allowing improper cross-examination;

3. The trial court erred by not curing the State of West Virginia's misleading cross-examination;

4. The trial court erred by denying the Petitioner his right to present his defense by denying the Petitioner's motion to be examined by his expert;

5. The evidence was woefully insufficient to convict him of First-Degree Murder beyond a reasonable doubt;

6. Ineffective assistance of counsel;

7. The trial court erred by giving the instruction which unconstitutionally shifted the burden of proof to the Petitioner in violation of due process of law;

8. The trial court erred by giving the jury an instruction defining "a reasonable doubt" by permitting the Prosecuting Attorney's self-introduction as a representative of "the citizens of Kanawha County" and by differentiating between direct and circumstantial evidence; and

9. Cumulative error in the trial-court proceedings deprived the Petitioner of his due process rights.

(<u>Id.</u>, pp. 6 - 7.) An omnibus hearing was conducted on July 20, 2011. (Document No. 15-4.) The parties agreed that no evidence or testimony was necessary and proceeded with arguments on the issues. (<u>Id.</u>) By "Order Denying Petitioner's Amended Petition For Writ of Habeas Corpus" entered on April 17, 2012, the Circuit Court denied Petitioner's *habeas* Petition. (Document No.

15-5.)

Petitioner, by counsel, Matthew A. Victor, filed his appeal concerning the Circuit Court's decision denying his *habeas* Petition. (Document No. 15-6.) In his appeal, Petitioner asserted the same nine assignments of error as asserted in his *habeas* Petition. (Id., p. 4.) By Memorandum Decision filed on June 7, 2013, the West Virginia Supreme Court of Appeals affirmed the decision of the Circuit Court. (Id., pp. 1 - 9.)

**C.      Section 2254 Petition:**

Petitioner, acting *pro se*, filed a Petition Under 28 U.S.C. § 2254 for Writ of *Habeas Corpus By a Person in State Custody* on November 8, 2013.[2] (Document No. 1.) In his Petition, Petitioner alleges the following grounds for *habeas* relief:

1.      Error in denying Petitioner's expert examination.

2.      Ineffective assistance of counsel:

      a.      Counsel failed to provide the Court with a reasonable explanation regarding his failure to arrange for the doctor to meet with the Petitioner in advance of the trial thus losing the use of defense expert witness, testing, and testimony that was crucial to proving the claim of lack of intent;

      b.      Counsel failed to file for an extension of time for good cause in requesting examination of Petitioner;

      c.      Counsel failed to put on exculpatory evidence to prove that the Petitioner had a disability which precludes from being able to form intent; a required element of 1st degree murder;

      d.      Counsel's failure to object to the jury instruction as to "intent" as the point of the issue of the mental disability of the Petitioner is that

---

[2]  By Standing Order, this matter was referred to United States Magistrate Judge R. Clarke VanDervort for submission of proposed findings of fact and a recommendation for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). (Document No. 2.) By Order entered on January 6, 2016, the above case was referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and a recommendation for deposition pursuant to 28 U.S.C. § 636(b)(1)(B). (Document No. 23.)

4

the Petitioner cannot form "intent;"

     e.     Counsel failed to effectively protect the Petitioner's rights in jury instruction whereby the Court mislead the jury as to reasonable doubt;

     f.     Counsel failed to effectively protect the Petitioner during impermissible cross-examination by the prosecution; and

     g.     Counsel failed to protect the Petitioner from prejudicial and unconstitutional decisions by the Court on evidentiary issues.

3.     Jury instruction error;

4.     Insufficiency of the evidence;

5.     The trial court violated the Petitioner's right to a fair trial by allowing improper cross examination; and

6.     The cumulative error in the trial court proceedings deprived the Petitioner of his due process rights.

(Id.) By Order entered on June 3, 2015, Judge VanDervort directed Respondent to file a Response to Petitioner's Petition. (Document No. 4.)

On August 21, 2015, Respondent filed his Answer. (Document No. 12.) On September 21, 2015, Respondent filed his Motion for Summary Judgment and Memorandum in Support. (Document Nos. 15 - 16.) As Exhibits, Respondent attaches the following: (1) A copy of Petitioner's trial transcripts (Document Nos. 15-1, 15-2, and 15-3.); (2) A copy of the transcripts from the omnibus hearing conduct on July 20, 2011 (Document No. 15-4.); (3) A copy of the Circuit Court's "Order Denying Petitioner's Amended Petition for Writ of Habeas Corpus" entered on April 17, 2012 (Document No. 15-5.); and (4) A copy of the West Virginia Supreme Court's "Memorandum Decision" filed on June 7, 2013, affirming the decision of the Circuit Court (Document No. 15-6.).

On November 18, 2015, Petitioner filed his Response in Opposition. (Document No. 22.)

5

As an Exhibit, Petitioner attaches a copy of a diagram of "The cerebral cortex" (Id., p. 13.)

By Proposed Findings and Recommendation entered on June 30, 2016, the undersigned recommended that Respondent's Motion for Summary Judgment (Document No. 15) be granted and Petitioner's Petition (Document No. 1) be dismissed. (Document No. 24.) By Order entered on September 30, 2016, United States District Judge Thomas E. Johnston declined to adopted the undersigned's Proposed Findings and Recommendation and re-referred the case for further consideration after determining it was unclear whether the undersigned applied the appropriate standard under Section 2254(d) in reviewing the state court's adjudication of Petitioner's claims. (Document No. 25.) Accordingly, the undersigned files this Amended Proposed Findings and Recommendation to clarify that the undersigned applied the appropriate standard under Section 2254(d).

## **FACTUAL BACKGROUND**

Sergeant Richard Rose testified that he had worked for the Kanawha County Sheriff's Office for approximately 14 years. (Document No. 15-1, p. 78.) Sergeant Rose stated that he came into contact with Petitioner on March 29, 2001, when he was "summoned to the mouth of Campbells Creek and Eight Mile Hollow in reference to a shooting." (Id., p. 80.) Sergeant Rose explained that Petitioner was located and arrested at his parent's residence on Eight Mile Hollow. (Id.) Sergeant Rose stated that he received a call from their communications that an individual claiming to Petitioner stated that he wanted to speak to the police regarding a shooting. (Id., pp. 83 – 84.) Upon entering the house, Sergeant Rose testified that Petitioner was sitting at the kitchen table with his parents and there was a pistol laying on the table. (Id., p. 84.) Prior to arriving that Petitioner's parent's resident, Sergeant Rose explained that he had been at the victim's residence (Mr. Light). (Id.) Sergeant Rose testified that he transported Petitioner to their headquarters in

Charleston and Petitioner was handed over to the detective bureau. (Id., pp. 81 and 82.)

Lieutenant Sean Crosier testified that he was a detective for the Kanawha County Sheriff's Office and had been employed as a detective for approximately 6 years. (Document No. 15-2, pp. 152 -153.) Lieutenant Crosier explained that after advising Petitioner of his constitutional rights, he interviewed Petitioner at their headquarters in Charleston on March 29, 2001. (Id., pp. 157 - 160.) Lieutenant Crosier testified that the interview was recorded. (Id., pp. 161 – 162.) The audio recording of the interview was played for the jury. (Id., pp. 165 - 185.) In the audio recording of the interview, Petitioner acknowledged that he was under arrest for killing Scotty Light ["the victim"] and that "I did it. I did it." (Id., pp. 167 - 169.) Petitioner stated that he and Richard Hackney travelled to the victim's residence because they were looking for Richard's girlfriend, Jessica Lambert. (Id., p. 169.) Petitioner explained that the victim was not home, but the victim's girlfriend, Kelli Ratliff, told them that the victim had "went down the road." (Id.) When Petitioner and Richard were leaving the victim's residence, the victim arrived and words were exchanged between the Petitioner and the victim. (Id.) Petitioner stated that he called the victim out on the lie that the victim had not taken Jessica and Duane "down the road." (Id., p. 175.) Petitioner stated that when he was leaving the victim's residence, the victim "reached over and smacked me; and when he did that, I just lost it. I ain't going to lie to you. I'll tell you like it is, man. I've been putting up with all of these godd**n years with these f**kers f**king with me, picking on me, since I got one arm; and I lost it, you know. I don't know what I'm doing. I mean, I do, but I don't." (Id., p. 170.) Petitioner stated that he shot the victim three times. (Id., p. 172.) Specifically, Petitioner explained that "I just got the gun and said, bam, bam, bam." (Id.) Petitioner stated that the gun was lying beside him on the truck seat. (Id., p. 177.) Petitioner explained that at the time of the shooting Petitioner was sitting in his truck and the victim was standing beside him. (Id., p.

181.) Petitioner stated that when he shot the victim, the victim "took off running behind me as I kept pulling the trigger." (Id.) Petitioner stated that after he shot the victim, he "got the hell out of there and went home and called you all." (Id., pp. 172 - 173.) Petitioner stated that he had had about five beers prior to the shooting, but he was not intoxicated at the time of the shooting. (Id., pp. 174 and 178.)

Kelli Ratliff testified that she was the victim's girlfriend and they had one child together. (Document No. 15-1, p. 174.) Kelli stated that on March 29, 2001, she and the victim were awakened by Jessica Lambert and Duane Lucas pounding on their door. (Id., p. 177.) Kelli explained that Jessica and Duane were wanting a ride down the road because Petitioner was shooting a gun at them and they were scared. (Id. and Document No. 15-2, p. 2.) Kelli testified that the victim agreed to give them "a ride down the road." (Document No. 15-2, p. 2.) Kelli stated that after the victim departed with Jessica and Duane, Petitioner and Richard Hackney arrived wanting to know the location of Jessica. (Id., p. 3.) Kelli explained that she did not know where the victim had taken Jessica and Duane, and she told Petitioner that the victim "took them down the road." (Id.) Kelli stated that Petitioner and Richard exited the house, she saw Petitioner's truck pull out, and she "went on to do what [she] needed to do." (Id., p. 4.) Kelli explained that she was busy fixing coffee, packing lunches, and getting ready for work. (Id., p. 5.) While fixing the coffee, Kelli stated that she saw the victim pull into the driveway. (Id.) Kelli explained that as the victim exited his vehicle, Petitioner pulled back into their driveway. (Id.) Kelli stated that she assumed Petitioner was inquiring where the victim had taken Jessica and she proceed to get ready for her day. (Id., p. 6.) Kelli stated that "I was in the living room getting things ready, and all of a sudden I heard - - I heard tires squeal, and then the next thing I heard was pow, pow, pow. And I was like, 'Oh, my goodness. That was gunshots.'" (Id.) Kelli explained that she ran to the back where she

8

met Richard screaming "Robbie shot Scotty, Robbie shot Scotty. Call 911." (Id., p. 7.) Kelli testified that she ran outside where she witnessed the victim laying in the driveway and saw Petitioner run over the victim and proceed down the road. (Id.) Kelli stated that she performed CPR on the victim until the paramedics arrived, but the only response was some gurgles from the victim. (Id., pp. 7 – 8.)

Jessica Lambert testified that on the day of March 28, 2001, Petitioner had drove her and her aunt to Charleston to the hospital. (Id., p. 55.) Jessica explained that her aunt was admitted to the hospital. (Id., p. 56.) Jessica stated that Petitioner had meet Duane Lucas at the hospital and the three of them decided to go to Petitioner's residence to drink. (Id., p. 57.) Jessica stated that the only persons present at Petitioner's residence was Petitioner, Jessica, and Duane. (Id., p. 58.) Jessica testified that later that evening Duane asked Jessica out on a date and Jessica agreed. (Id.) Jessica explained that Petitioner was upset by Jessica's acceptance of the date with Duane. (Id.) Jessica stated that Petitioner reacted by touching her leg and when she instructed him not to, Petitioner kicked her out of the residence. (Id., p. 59.) Jessica testified that Duane "stood up for her" and Petitioner also kicked him out of the house. (Id., p. 61.) Jessica explained that after she and Duane exited Petitioner's residence, Petitioner exited his house with a pistol. (Id.) Jessica stated that Petitioner dropped the gun and they ran up the road as Petitioner was cussing them and yelling that he was going to kill them. (Id.) Jessica testified that Petitioner then shot twice, but she did not know whether Petitioner shot towards them or just shot in the air. (Id.) Jessica explained that she and Duane ran down the road to the victim's residence. (Id., p. 63.) Jessica stated that the victim was a "friend of the family" and was the "first person [she] knew." (Id.) Jessica testified that the victim drove her and Duane to Duane's residence. (Id.) Jessica acknowledged that prior to that night, she had never been afraid of Petitioner and that Petitioner had taken care of her and

been a good friend. (Id., p. 78.)

Richard Hackney testified that he had a "boyfriend-girlfriend" relationship with Jessica in March, 2001. (Id., p. 85.) Richard further explained that Petitioner was only an acquaintance and the victim was like an uncle to him. (Id., pp. 84 – 85.) Richard testified that he went to Jessica's grandmother's residence on March 28, 2001, after he got off work. (Id., p. 86.) Richard stated that Jessica was not at her grandmother's residence, but he waited for her to arrive. (Id.) Richard testified that around 4:00 a.m. he was awakened by Petitioner pounding on Jessica's grandmother's door. (Id., p. 87.) Richard testified that Petitioner stated that Jessica was "down the road with a guy" and that "if Richard loved her, he would go get her." (Id.) Richard stated that he got in the truck with Petitioner and they drove to the victim's residence looking for Jessica. (Id., p. 88.) Richard explained during the drive Petitioner stated that "If I can't have [Jessica], then nobody will" and that Petitioner stated that he had shot in the air two times. (Id., pp. 88 – 89.) Richard acknowledged that when they arrived that the victim's residence, Richard knocked on the door and Kelli answered the door. (Id., p. 90.) Richard testified that Kelli informed him that the victim had taken Jessica and Duane "down the road." (Id.) Richard explained that he and the Petitioner left the victim's residence and got less than "a quarter down the road and here was [the victim] on his way back." (Id.) Richard stated that Petitioner turned around and pulled back into the victim's drive way. (Id.) Richard explained that he got out of the truck and went over to the victim where he and Petitioner inquired as to the location of Jessica. (Id.) Richard testified that the victim first told them that he did not know the location of Jessica. (Id.) Richard stated that they informed the victim that Kelli had told them that the victim had taken Jessica and Duane "down the road." (Id.) Richard stated that the victim then told them where he took Jessica and Petitioner became angry because the victim had initially lied to them. (Id.) Richard testified that Petitioner then got back in

10

his truck and began spinning up the victim's driveway. (Id.) Richard explained that the victim instructed Petitioner to stop spinning and Petitioner stopped in the driveway and the two engaged in a verbal argument. (Id.) Richard stated that he heard Petitioner say "f**k you" to the victim, the victim stepped back, and Petitioner started shooting. (Id.) Richard testified that he yelled for the Petitioner to stop and "he wouldn't quit." (Id.) Richard stated that he never saw any physical contact during the argument. (Id.) Richard explained that he ran inside and told Kelli that the victim had been shot and he went back outside. (Id.) Richard testified that "I was looking [Petitioner] right in the eyes, and he was looking me right in the eyes, and then he started peeling backwards and ran over, like, running over [the victim]." (Id.) Richard explained that Petitioner then speed forward across a ditch and down the road. (Id.) Richard testified that when he approached the victim "he was laying down on the ground, taking his last few breaths, just - - you could hear, like, snoring, his eyes were, like partially open, just lying there, looking up." (Id.)

Lieutenant R. Reed testified that he was employed with the West Virginia State Police as the head of the forensic firearms and toolmarks section of the lab. (Id., p. 107.) Lieutenant Reed was a qualified expert in the area of firearms examination. (Id., p. 109.) Lieutenant Reed stated that he examined the murder weapon, which was a .22 caliber Taurus revolver with the capacity of holding nine projectiles. (Id., pp. 111.) Lieutenant Reed explained that the gun was a double and single action revolver. (Id.) Lieutenant Reed testified that in the double action mode of fire, where pulling the trigger rotates the hammer and cocks the hammer, "it took 13 ½ pounds of pressure on the trigger to fire this firearm." (Id., p. 112.)

Paul Dryden testified that he was working as a 911 operator on March 29, 2001. (Id., 127.) Mr. Dryden testified that 911 calls are recorded in the ordinary course of business. (Id., p. 128.) Mr. Dryden stated that he was the operator who took Petitioner's call on March 29, 2001. (Id.) The

11

audio recording of the 911 call was played for the jury. (Id., p. 129.) In the recording, the Petitioner stated the following:

| THE DISPATCHER: | 911 Emergency. |
| --- | --- |
| MR. JOSEPH: | Hey, my name is Robbie Joseph. I live at Eight Mile Hollow. I just shot Scotty Light right at the mouth of Eight Mile Hollow, and y'all better get up here and get him before he dies. |
| THE DISPATCHER: | Okay, what happened, sir? |
| MR. JOSEPH: | I just shot the son-of-a bitch. |
| THE DISPATCHER: | Who is it you shot? |
| MR. JOSEPH: | Scotty Light, right there at the mouth of Eight Mile beside the post office. I live right beside the church. I'll be here waiting on you. |

* * *

(Id., pp. 129 – 130.)

Petitioner testified that he was involved in a serious motorcycle accident on July 26, 1989. (Id., pp. 200.) Petitioner explained that he "crushed the helmet off [his] head," "it just crumbled the left side of my skull, my forehead, broke my jaw, my nose and - - let's see - - my collarbone was broken; and then the brachial plexus nerves to my left arm where they go into the spine, they were pulled out of the spine and resulted in paralyzation of the left arm." (Id., p. 201.) Petitioner acknowledged that he was treated by Dr. William McGee, who advised Petitioner that he would need to be careful not to get hit in the left forehead because "if [he] was hit in that area just right, it could kill [him]." (Id., p. 201 and Document No. 15-3, p. 2.) Petitioner stated that following his accident, he became argumentative and angered easily. (Document No. 15-3, pp. 2 – 3.) Petitioner stated that at the time of the shooting, he was receiving Social Security Disability based on the injuries he received in the motorcycle accident. (Id., pp. 4 – 5.) Petitioner testified that he was treated by a psychiatrist, Dr. Mark Hughes. (Id., p. 5.) Petitioner stated that Dr. Hughes had

12

prescribed Paxil, which Petitioner was taking at the time of the shooting. (Id., p. 6.) Petitioner testified that on March 28, 2001, Jessica's aunt was sick and had to be taken to the hospital by ambulance. (Id., pp. 7 – 8.) Petitioner explained Jessica accompanied her aunt in the ambulance to the hospital and that he followed the ambulance so Jessica would have a ride home. (Id., p. 8.) Petitioner stated that while he was at the hospital waiting, he ran into Duane Lucas, a drinking associate. (Id., p. 9.) Petitioner testified that he, Duane, and Jessica decided to return to Petitioner's house to party. (Id., p. 10.) Petitioner stated at as soon as they arrived at Petitioner's house, Jessica "wanted to know if she could wear my - - I had, like, a stars and stripes bikini swimming trunks" and a T-shirt. (Id.) Petitioner testified that he agreed and Jessica changed to the swimming trunks. (Id., p. 11.) Petitioner explained that Jessica got sick after drinking a whole bottle of wine and about a half of a can of beer. (Id., pp. 12 – 13.) Petitioner testified that the atmosphere of the party changed after Jessica got sick. (Id., p. 15.) Petitioner acknowledged that he put his hand on Jessica's leg and Jessica told him that she did not want to jeopardize their friendship. (Id., p. 16.) Petitioner stated that he asked Jessica to leave and Duane decided to leave at the same time because Duane had to work the next morning. (Id., pp. 16 – 17.) Petitioner explained that he offered to give Duane a ride, but Duane decline because he thought Petitioner was drunk. (Id., p. 17.) Petitioner stated that about a minute after they left, he realized that Jessica left with his swimming trunks. (Id.) Petitioner explained that this "ran through [him] wrong" and he stepped outside and fired two shots into the air with his deer rifle. (Id., pp. 17 – 18.)

Petitioner stated that he then got his pistol and drove to Jessica's grandmother's house to see if the grandmother would help him find Jessica. (Id., pp. 18 – 19.) Petitioner explained that he was concerned because he "had a feeling that she was going to run away." (Id., p. 19.) Petitioner acknowledged that Richard Hackney answered the door and Petitioner informed him that Jessica

13

had went down the road and he was going to look for her because he was concerned she might run away. (Id., pp. 19 – 20.) Petitioner explained that he asked Richard to join him because Richard was concerned about Duane being with Jessica. (Id., p. 20.) Petitioner denied making a statement to the effect that if Petitioner could not have Jessica, nobody could. (Id., pp. 20 - 21.) Petitioner acknowledged that they stopped at the victim's house looking for Jessica, and Kelli told him that the victim had taken Jessica and Duane "down the road." (Id., p. 21.) Petitioner stated that he and Richard left and as they were driving down the road, they passed the victim returning home. (Id., pp. 21 - 22.) Petitioner acknowledged that the victim initially denied driving Jessica and Duane anywhere but when confronted, the victim acknowledged that he drove them to Duane's house. (Id., p. 22.) Petitioner further acknowledged that he was irritated that the victim had lied to him, but he not "fly-off-the-handle mad." (Id., pp. 22 – 23.) Petitioner stated that Richard did not get back into the vehicle with him and he "tapped the gas and spun some gravel as [he] was backing up, and then [the victim] come running over." (Id., p. 23.) Petitioner testified that the victim approached him yelling about Petitioner spinning gravels, opened the truck door, and smack Petitioner in the head. (Id., p. 24.) Petitioner explained the events that followed as follows:

> Well, it, like, blue flashed and sort of knocked me off balance. And when I put my hand down on the seat to catch myself because it knocked me over, that's when my hand landed on the gun and just - - if I'd thought, I'd never done that. I mean, I just come up squeezing the trigger just without - - you know, just a reaction.

(Id., p. 25.) Petitioner stated that when Kelli ran out screaming, he realized it was not a dream and his first thought was to "put the truck in reverse and go call 911." (Id., p. 26.) Petitioner explained that he was not aware that he had ran over the victim until the police told him. (Id.) Petitioner testified that he returned home, called 911, and cooperated with the police. (Id., p. 27.)

Dr. Mark Hughes, a psychiatrist, testified he first saw Petitioner on August 29, 2000, when he conducted an evaluation prior to Petitioner entering the substance abuse program at Shawnee

14

Hills. (Id., p. 45.) Dr. Hughes explained that Petitioner was there for DUI classes, which were mandatory for Petitioner to get his drivers licenses back following a DUI conviction. (Id.) Dr. Hughes testified that he saw Petitioner on three occasions: August 29, 2000, September 26, 2000, and January 2001. (Id., p. 47.) Dr. Hughes testified that he had reviewed copies of x-ray reports and a more recent CAT scan of Petitioner's brain, which showed "some deterioration or encephalomalacia in the frontal lobe areas of his brain." (Id., p. 46.) Dr. Hughes explained that the frontal lobe of your brain "controls what we think of as executive functioning or higher functioning, that part of your brain that helps you to think about consequences and think things through." (Id.) Dr. Hughes diagnosed Petitioner with a mood disorder secondary to a generalized medical condition, which was Petitioner's traumatic brain injury. (Id., p. 48.) Dr. Hughes opined that Petitioner had a diminished capacity to form a premeditation. (Id., p. 54.) Dr. Hughes explained that it was "consistent with a frontal lobe injury that [Petitioner] could act impulsively and do something like that without considering the consequences or what might happen after that." (Id.) Dr. Hughes further opined that it would be consistent with Petitioner's frontal lobe injury for him to have shot the victim without thinking about intent. (Id., p. 55.) Dr. Hughes explained that people with frontal lobe injures "act impulsively without thinking about intent or malice and then later feel remorse when they have time to think about it." (Id.) Dr. Hughes, however, acknowledged that he had only conducted three mental status evaluations that consisted of interviews and no type of testing. (Id., p. 56.) Dr. Hughes further acknowledged that Petitioner was capable of premeditating and acting with malice. (Id., p. 58.)

Dr. Robert Solomon, a forensic psychologist, testified that he evaluates people to see if they are competent to stand trial or are criminally responsible. (Id., pp. 61 – 63.) Dr. Solomon stated that he conducted an evaluation of Petitioner in January, 2002. (Id., 65.) Dr. Solomon

explained that his evaluation involved four sessions with Petitioner lasting for a total of approximately six hours, and he met with Petitioner's parents and several other people who knew Petitioner.[3] (Id.) Dr. Solomon further stated that he reviewed the police reports from the Kanawha County Sheriff, the West Virginia University School of Medicine forensic psychiatric evaluation, Dr. Hughes' records, records from the Neurological Associates, and CAMC medical records. (Id.) Dr. Solomon concluded that Petitioner "underwent a radical personality change" following his motorcycle accident. (Id., pp. 67 – 68.) Dr. Solomon stated that as a result of the motorcycle accident, Petitioner "had symptoms strongly suggestive of post-traumatic stress disorder," an "organic-based mood disorder, and an almost certain organic brain syndrome known as dementia. (Id., p. 74.) Dr. Solomon opined that "there was no question in [his] mind that [Petitioner] was competent to stand trial. He understood the nature of the charges against him and was able to relate to his attorney in a satisfactory manner." (Id., p. 75.) Dr. Solomon further determined that Petitioner was criminally responsible for the act because he was "not out of touch with reality when the shooting occurred." (Id., p. 76.) Dr. Solomon, however, concluded that Petitioner "suffered from a diminished capacity at the time of offense that precluded him from forming an intent and premediating the act at - - the act that occurred at the time." (Id., p. 77.) Dr. Solomon stated that in his opinion, "this is one of the strongest cases of diminished capacity [he] had seen in [his] 20-some years of forensic practice." (Id., pp. 81 – 82.) Dr. Solomon explained that Petitioner was "not out of his mind" and "he has good decision-making powers when he's not put in a situation of immediate stress and possible harm." (Id., p. 77.) Dr. Solomon testified that he did not believe Petitioner acted from malice. (Id., pp. 78 and 82.) Dr. Solomon explained that he

---

[3] Dr. Solomon explained that he met with Petitioner's aunt, Ellen Carter; a cousin, Rita Hayes; and old friend/girlfriend, Cheryl Addison.

16

believed Petitioner's "reactions were more reflexive than thought about, worried about, premediated, or controlled. I was an - - it was a response to what he perceived as an immediate threat." (Id.) Dr. Solomon opined that Petitioner also had post-traumatic stress disorder, which includes "heightened startled responses, that includes increased awareness of surroundings, that includes being overly suspicious." (Id., p. 79.) Dr. Solomon explained that there was "no indication that [Petitioner] suffered from any loss of intelligence from his brain injury." (Id., p. 80.) Dr. Solomon acknowledged that Petitioner had the capacity to premediate and act maliciously. (Id., pp. 85 – 86.)

Dr. Robert Granacher, a neuropsychiatrist and a forensic psychiatrist, testified that he evaluated Petitioner. (Id., pp. 94 – 95, 103.) Dr. Granacher explained that he reviewed a CT scan of Petitioner's brain that was conducted on March 25, 2004. (Id., p. 103.) Dr. Granacher testified that the CT scan showed "primarily injury to the left side of the head" and an area of dead brain cells in the frontal lobe. (Id., pp. 103-04.) Dr. Granacher explained that he reviewed the following: The original medical records from Petitioner's brain injury; The medical records from the brain surgery that Petitioner underwent after his injury; Petitioner's orthopedic records; Petitioner's psychiatric evaluations; Examinations by Dr. Hughes and Dr. Solomon; The Prosecuting Attorney's report; The Sheriff Department's report; The State's discovery disclosure; The grand jury testimony of a detective; Dr. Beard, Dr. Hughes, and Dr. Solomon's trial testimony; The appellate brief of the West Virginia Supreme Court; and the West Virginia Supreme Court's opinion. (Id., p. 113.) Dr. Granacher opined that Petitioner did not premeditate or act with malice at the time of the shooting. (Id., p. 114.) Dr. Granacher explained that Petitioner had frontal lobe damage, which affects how fast a person can respond in order to think through or plan. (Id., p. 115.) Dr. Granacher stated that he believed the shooting "was an impulsive act, not a malicious

act." (Id., p. 119.) Dr. Granacher opined that Petitioner acted without thinking, which is consistent with a person with a frontal lobe disorder. (Id., pp. 119 – 120.) Dr. Granacher testified that if Petitioner is given sufficient time, Petitioner is capable of premeditating and acting with malice. (Id., pp. 121 - 122.) Dr. Granacher explained that "time is the issue. If you have frontal lobe injury, if time gets compressed and things happen very rapidly, then you cannot think." (Id., p. 122.) Dr. Granacher opined that given the circumstances and the lack of time surrounding the shooting, Petitioner had a diminished capacity to premediate and act with malice. (Id., pp. 122 - 123.) Dr. Granacher, however, explained that Petitioner was competent to stand trial because he has sufficient time to think, plan and organize. It's where things occur rapidly or quickly that he would be at risk." (Id., p. 124.) Dr. Granacher testified that there are neuropsychiatric tests to determine executive functioning and if Dr. Solomon testified otherwise, Dr. Solomon would be incorrect. (Id., pp. 132 – 133.) Dr. Granacher acknowledged that in reaching his opinions, he relied on Dr. Solomon's testimony and reports. (Id., p. 133.) Dr. Granacher testified that he did not conduct a complete medical history, a psychiatric mental status examination, a psychological assessment, or a neuropsychological assessment on Petitioner. (Id., p. 135.) Dr. Granacher acknowledged that Dr. Hughes did not conduct a neuropsychiatric test on Petitioner, but stated that Dr. Solomon did some neuropsychiatric testing. (Id., pp. 142 - 143.) Dr. Granacher explained that imaging tests are used to determine if there is damage to the frontal lobes and neuropsychiatric testing measures how much the frontal lobe damage affects that person. (Id., pp. 156 – 157.) Dr. Granacher further testified that an examination of Petitioner would not have changed his opinion because his "opinion [was]based on [Petitioner's] original accident in 1989, the brain damage that's present and lack of brain tissue that was present on the CT scan, and what I know from what [Petitioner] told the police about his behavior . . . So, the tests wouldn't add to that at all." (Id., pp. 159 and

18

168.)

Dr. Ralph Smith, Jr., a forensic psychiatrist, testified that he interviewed and conducted a mental status examination on February 20, 2002. (Id., p. 171.) Dr. Smith explained that a mental status examination is a "formalized assessment or evaluation of the person's thinking, their cognitive functioning as we call it, their emotions, memory, their mood, their affect." (Id.) Dr. Smith stated that the mental status examination included psychological and neuropsychiatric testing, which are designed to test things like his executive functioning ability of his brain. (Id., pp. 173 - 174.) Dr. Smith stated the neuropsychiatric tests included the Wisconsin Card Sorting Test and the Short Category Test, which are important in determining executive functioning. (Id., p. 177.) Dr. Smith testified that Petitioner scored above average on the Wisconsin Card Sorting Test and scored average on the Short Category Test. (Id., pp. 177 – 180.) Dr. Smith further stated that he tested Petitioner for malingering and concluded that Petitioner put forth adequate effort on the foregoing test. (Id., pp. 181 – 183.) Dr. Smith testified that it was his opinion that Petitioner was criminally responsible. (Id., p. 186.) Dr. Smith further opined that Petitioner's executive functioning was not effected to the point that Petitioner could not premeditate or act with malice. (Id., p. 187.) Specifically, Dr. Smith testified that his report concluded as follows:

> We do not believe that Mr. Joseph's various mental disorders significantly impaired his reasoning, his ability to weigh alternatives, or his ability to make choices at the time of the alleged crime. He was angry at the victim and had argued with him, felt the victim was "smart aleckly," and escalated events by gunning his engine and spinning his tires. He took purposive action in attempting to find Jessica Martin, the object of his lustful desires. Jealousy had been raised due to the interaction of Jessica with Duane Lucas. Certainly, the alleged assault by the victim on the defendant could have triggered a self-defensive posture on the part of the defendant. Shooting the unarmed victim five times as he ran from the truck would not appear to be simple self-defense.

(Id., pp. 187 – 188.) Dr. Smith acknowledged that Petitioner had damaged to his frontal lobe, which controls a person's executive function. (Id., p. 193.) Dr. Smith further acknowledged that many

19

people with frontal lobe damage are implosive and act without thinking about the consequences. (Id., p. 195.)

## THE APPLICABLE STANDARDS

Federal *habeas* relief is available to a State prisoner under 28 U.S.C. § 2254, only if the prisoner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a)(2002); See also Sargent v. Waters, 71 F.3d 158, 160 (4th Cir. 1995). Section 2254(d) provides that when the issues raised in a Section 2254 Petition were raised and considered on the merits in State Court *habeas* proceedings, federal *habeas* relief is unavailable unless the State Court's decision:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

As to the foregoing, the petitioner carries the burden of proof. Cullen v. Pinholster, 563 U.S. 170, 181, 131 S.Ct. 1388, 1398, 179 L.Ed.2d 557 (2011)(citation omitted). In Williams v. Taylor, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), the Supreme Court stated that under the "contrary to" clause in § 2254(d)(1), a federal *habeas* Court may grant *habeas* relief "if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 412-13, 120 S.Ct. at1523. A federal *habeas* Court may grant relief under the "unreasonable application" clause of § 2254(d)(1) where the State Court identified the appropriate Supreme Court precedent but unreasonably applied the governing principles. Id. When a petitioner challenges the factual determination made by the State Court, "federal habeas relief is available only if the state court's decision to deny post-conviction relief

was 'based on an unreasonable determination of the fact.'" 28 U.S.C. § 2254(d)(2). In reviewing

a State Court's ruling on post-conviction relief, "we are mindful that 'a determination on a factual

issue made by the State court shall be presumed correct,' and the burden is on the petitioner to

rebut this presumption 'by clear and convincing evidence.'" Tucker v. Ozmint, 350 F.3d 433, 439

(4th Cir. 2003); also see 28 U.S.C. § 2254(e).[4] On this framework, consideration should be given

to Respondent's Motion for Summary Judgment.

## **Motion for Summary Judgment:**

Summary judgment is appropriate under Federal Rule of Civil Procedure 56 when no

genuine issue of material fact exists and the moving party is entitled to judgment as a matter of

law. Once the moving party demonstrates the lack of evidence to support the non-moving party's

claims, the non-moving party must go beyond the pleadings and make a sufficient showing of facts

presenting a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548,

---

[4] Title 28, U.S.C. Section 2254(e) provides:

> (e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

> (2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that –

>> (A) the claim relies on –
>>> (I) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>>> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

>> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

91 L.Ed.2d 265 (1986); <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 -

87, 106 S.Ct.1348, 89 L.Ed.2d 538 (1986). All inferences must be drawn from the underlying facts

in the light most favorable to the non-moving party. <u>Matsushita</u>, 475 U.S. at 587, 106 S.Ct. at 1356.

Summary judgment is required when a party fails to make a showing sufficient to establish an

essential element of a claim, even if there are genuine factual issues proving other elements of the

claim. <u>Celotex</u>, 477 U.S. at 322-23, 106 S.Ct. at 2552-53. Generally speaking, therefore, summary

judgment will be granted unless a reasonable jury could return a verdict for the non-moving party

on the evidence presented. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48, 106 S.Ct. 2505,

91 L.Ed.2d 202 (1986). If no facts or inferences which can be drawn from the circumstances will

support Petitioner's claims, summary judgment is appropriate.

## <u>ANALYSIS</u>

### 1.  <u>Examination by Dr. Granacher</u>:

In his Petition, Petitioner argues that the trial court erred "in denying Petitioner's expert

examination." (Document No. 1, p. 7.) Petitioner explains that trial counsel filed a motion

requesting that Petitioner be examined by Dr. Granacher, but Petitioner complains that the trial

court improperly denied the motion. (<u>Id.</u>) Petitioner alleges that an examination by Dr. Granacher

would have "prove[d] a mental disability in which Petitioner cannot form intent, a vital element of

the crime of 1st degree murder." (<u>Id.</u>) Petitioner further states that "the expert was present to

perform the test and to testify at trial." (<u>Id.</u>)

In his Motion for Summary Judgment, Respondent argues that "there was no error in the

denial of the Petitioner's motion to allow Dr. Granacher to examine him in jail on the eve of trial."

(Document No. 16, p. 13.) First, Respondent argues that "trial error that does not touch upon a

Constitutional issue is not reviewable by a Court in a habeas proceeding." (<u>Id.</u>) Second,

Respondent contends that Petitioner was not prejudiced by the denial. (Id.) Respondent explains that "Petitioner had other experts that had examined him, such as Dr. Solomon, and in Granacher's own words, an examination would not have changed a single word of the reports he wrote about the Petitioner four months prior to trial." (Id.) Respondent further argues that the trial court appropriately denied Petitioner's motion because Petitioner's "first attempt at such a visit occurred no earlier than August 6, 2004," which was after the trial had begun. (Id.) Respondent concludes that there was "simply no error or harm done in denying that request." (Id.)

In Response, Petitioner argues that the trial court erred by denying his motion "to be examined by one of his experts at the jail the evening before the State's expert was to testify, stating that the motion was untimely and would cause unfair prejudice to the State." (Document No. 22, p. 3.) Petitioner contends that the trial court should have granted his motion and ordered that Petitioner "undergo in depth psychiatric/psychological examination and continued all further proceedings until both sides had ample time to examine the reports of the examining team of psychiatrists and psychologist." (Id.) Petitioner asserts that had an examination been conducted, "it would have been determined that there was no feasible way that the Petitioner was capable of premeditated murder or any other type of 1st degree murder." (Id., p. 4.) Petitioner states that it was "virtually impossible for Dr. Granacher, or any other doctor, to give any type of diagnosis without conducting examinations/tests on the Petitioner." (Id., p. 7.)

Regarding Petitioner's above *habeas* claim as presented in his Petition, the West Virginia Supreme Court found as follows:

> We find no merit in petitioner's contention that the trial court erred in preventing petitioner to be examined by his own expert, Dr. Granacher, while incarcerated. The first attempt at such visit occurred when Dr. Granacher appeared without notice at the South Central Regional Jail on the eve of the second trial, or about August 6, 2004. Jail personnel declined to permit the examination without a court order. On August 9, 2004, defense counsel requested that Dr. Granacher be permitted access

23

to petitioner at the jail. Upon inquiry, trial counsel stated that the visit would change neither Dr. Granacher's opinion nor his testimony and no additional report would be generated. The trial court denied such request based upon the previous ruling that expert opinions and the bases therefore be disclosed in advance of trial. We find that the trial court did not abuse its discretion in this regard. Furthermore, a habeas corpus proceeding is not a substitute for a writ of error. Trial error, not involving error of constitutional dimension, is not reviewed.

(Document No. 15-6, p. 6.)

Generally, federal *habeas* relief is available with respect to a trial court's evidentiary rulings, only if the ruling denied the defendant the right to a fair trial. Barbe v. McBride, 521 F.3d 443, 452 (4th Cir. 2008). When the challenged evidentiary rulings "so infected the entire trial that the resulting conviction violates due process," it is presumed that the defendant was denied a fair trial. Cupp v. Naughten, 414 U.S. 141, 147, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973). The "right to due process guarantees the right to a fair opportunity to defend against the State's accusations. . .." United States v. Jinwright, 683 F.3d 471, 482-83 (4th Cir. 2012)(internal quotations omitted). This right, however, is not unlimited. See United States v. Scheffer, 523 U.S. 303, 308, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998)(recognizing defendant's right to present relevant evidence is subject to reasonable restrictions). "A defendant's interest in presenting such evidence may . . . bow to accommodate other legitimate interest in the criminal trial process." Id.(citations omitted). The exclusion of evidence as a result of accommodating these other legitimate interest is only unconstitutional where the exclusion "has infringed upon a weighty interest of the accused" or "significantly undermined the fundamental elements of the defendant's defense." Id. at 308, 315.

The undersigned finds that Petitioner's above claim is without merit because there is no evidence that the State *habeas* Court's determination was contrary to, or an unreasonable application of, clearly established federal law; or based on an unreasonable determination of facts. The State *habeas* court determined that the trial court properly denied Petitioner's request for an

24

examination by Dr. Granacher on the eve of trial. Petitioner does not dispute that such a request was made on the eve of trial, but argues that the trial court should have ordered a continuance and allowed the examination. Petitioner now argues that an examination by Dr. Granacher would have proved Petitioner was not capable of "premeditated murder or any other type of 1st degree murder." The record, however, does not support Petitioner's above argument. The record reveals that trial counsel acknowledged than an examination would not have changed Dr. Granacher's opinion or testimony. (Document No. 15-6, p. 6.) During the underlying trial, Dr. Granacher testified that an examination of Petitioner would not alter his opinion that Petitioner did not premeditate or act with malice at the time of the shooting. (Document No. 15-3, pp. 159 and 168.) Specifically, Dr. Granacher testified that his "opinion [was]based on [Petitioner's] original accident in 1989, the brain damage that's present and lack of brain tissue that was present on the CT scan, and what I know from what [Petitioner] told the police about his behavior . . . So, the tests wouldn't add to that at all."[5] (Id.) The record, therefore, reflects that an examination of Petitioner by Dr. Granacher would not have changed Dr. Granacher's testimony, which was favorable to Petitioner. (Id.) Based on the foregoing, the undersigned finds no indication that the denial of an examination by Dr. Granacher "infringed upon a weighty interest" or "significantly undermined the fundamental elements" of Petitioner's defense resulting in a violation of due process. Based on the foregoing, the undersigned finds that the State *habeas* Court's determination on the above claim was not contrary to, or an unreasonable application of, clearly established federal law; or based on an

---

[5]   Dr. Granacher explained that in reaching his conclusion, he reviewed the following: The original medical records from Petitioner's brain injury; The medical records from the brain surgery that Petitioner underwent after his injury; Petitioner's orthopedic records; Petitioner's psychiatric evaluations; Examinations by Dr. Hughes and Dr. Solomon; The Prosecuting Attorney's report; The Sheriff Department's report; The State's discovery disclosure; The grand jury testimony of a detective; Dr. Beard, Dr. Hughes, and Dr. Solomon's trial testimony; The appellate brief of the West Virginia Supreme Court; and the West Virginia Supreme Court's opinion. (Document No. 15-3, p. 113.)

unreasonable determination of the facts. Accordingly, the undersigned respectfully recommends that Respondent's Motion for Summary Judgment be granted as to the above ground.

**2.  Ineffective Assistance of Counsel:**

The standards established by the United States Supreme Court in determining whether or not a defendant was denied his Sixth Amendment right to effective assistance of counsel are set forth in Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Ineffective assistance of counsel claims consist of mixed questions of fact and law. Id. Under the two-pronged standard, a Petitioner must show (1) that counsel's performance was so deficient that it fell below an objective standard of reasonableness, and (2) that counsel's deficiency resulted in prejudice so as to render the results of the trial unreliable. Id. at 687-91, 104 S.Ct. at 2064-66. Counsel's performance is entitled to a presumption of reasonableness and judicial review of counsel's strategic decisions is highly deferential. Id. at 689, 104 S.Ct. at 2065. Thus, a petitioner challenging his conviction on the grounds of ineffective assistance must overcome a strong presumption that the challenged actions constituted sound trial strategies. Id. The Court in Strickland cautioned against the ease in second-guessing counsel's unsuccessful assistance after the adverse conviction and sentence are entered. Id. The Fourth Circuit Court of Appeals specifically recognized that ineffective assistance of counsel may not be established by a "Monday morning quarterbacking" review of counsel's choice of trial strategy. Stamper v. Muncie, 944 F.2d 170, 178 (4th Cir. 1991), cert. denied, 506 U.S. 1087 (1993). Applying this standard, and based upon all of the evidence of record, the Court will address the merits of each of Petitioner's allegations of ineffective assistance of counsel as set forth above.

**A.  Examination by Dr. Granacher:**

In his Petition, Petitioner argues that "counsel failed to provide the Court with a reasonable

explanation regarding his failure to arrange for the doctor to meet with the petitioner in advance of the trial thus losing the use of defense expert witness, testing, and testimony that was crucial to proving the claim of lack of intent." (Document No. 1, p. 9.)

In his Motion for Summary Judgment, Respondent argues that counsel did not act ineffectively by failing to "belabor the Court with explanations for the last minute request for Dr. Granacher's interview." (Document No. 16, p. 14.) Respondent explains that "[t]here is simply no explanation that trial counsel could have given the Court for the last minute motion to have the Petitioner examined in jail by Dr. Granacher." (Id.) Furthermore, Respondent argues that Petitioner was not prejudiced by trial counsel's conduct. (Id.) Respondent explains that Dr. Granacher and trial counsel admitted "that the report and testimony offered by the doctor would not have changed if the interview had taken place." (Id.)

In Response, Petitioner argues that "[h]ad counsel for Petitioner motioned the Court for a proper psychiatric/psychological examination, and the Court ordered the same, it would have been determined that there was no feasible way that Petitioner was capable of premediated murder or any other type of 1st degree murder." (Document No. 22, p. 4.)

Regarding Petitioner's above *habeas* claim as presented in his Petition, the West Virginia Supreme Court found as follows:

> Petitioner also rises an ineffective assistance of counsel claim in this appeal. He asserts that counsel erred by not having petitioner personally examined by his retained expert, Dr. Granacher. When addressing this matter, the circuit court noted that both trial counsel and Dr. Granacher stated that any personal examination would do nothing to change the opinion that petitioner suffered from diminished capacity due to frontal lobe brain damage. Dr. Granacher testified regarding the clinical significance of frontal lobe brain damage and how it impairs planning functions. He reviewed petitioner's medical history, including psychiatric evaluations, and specifically referred to petitioner's CT brain scan which revealed frontal lobe brain damage. Accordingly, we find that the failure to arrange for a personal examination with Dr. Granacher does not rise to the level of ineffective assistance. His opinion and testimony would have been the same, and consequently,

27

the result of the trial would have been the same.

(Document No. 15-6, p. 8.)

The undersigned finds that there is no evidence that the State *habeas* Court's determination on the above claim was contrary to, or an unreasonable application of, clearly established federal law; or based on an unreasonable determination of facts. The State *habeas* court determined that trial counsel's failure to have Petitioner examined by Dr. Granacher did not result in prejudice to Petitioner.[6] (Document No. 15-5, pp. 12 - 14 and Document No. 15-6, p. 8.) For the reasons stated above in Section One, the undersigned finds that there is no indication that Petitioner was prejudiced by the lack of an examination by Dr. Granacher. The record reveals that Dr. Granacher testified that an examination of Petitioner would not alter his opinion that Petitioner did not premeditate or act with malice at the time of the shooting. (Document No. 15-3, pp. 159 and 168.) Petitioner has failed to present any evidence establishing that he was prejudiced by trial counsel's failure to arrange for a timely examination by Dr. Granacher. Based on the foregoing, the undersigned finds that the State *habeas* Court's determination on the above claim was not contrary to, or an unreasonable application of, clearly established federal law; or based on an unreasonable determination of the facts. Therefore, the undersigned respectfully recommends that Respondent's Motion for Summary Judgment be granted as to Petitioner's above claim of ineffective assistance of counsel.

### B.  Failure to File a Motion for Extension of Time:

In his Petition, Petitioner argues that "counsel failed to file for an extension of time for good cause in requesting examination of Petitioner." (Document No. 1, p. 9.)

---

[6]   The West Virginia Supreme Court adopted and incorporated the Circuit Court's "well-reasoned findings and conclusions as to all the assignments of error raised in this appeal." (Document No. 15-6.)

In his Motion for Summary Judgment, Respondent argues that trial counsel was not ineffective in failing to file a motion requesting an extension of time. (Document No. 16, pp. 14 – 15.) Respondent again argues that Petitioner was not prejudiced because "Dr. Granacher's testimony would have been the same." (Id.) Respondent, therefore, contends that the above claim of ineffective assistance of counsel should be denied. (Id.)

In Response, Petitioner continues to argue that counsel was ineffective in his "failure to file for an extension of time." (Document No. 22, p. 5.) Petitioner claims that "had counsel for the Petitioner motioned the Court for a proper psychiatric/psychological examination, and the Court ordered the same, it would have been determined that there was no feasible way that the Petitioner was capable of premediated murder or any other type of 1st degree murder." (Id., p. 4.)

Regarding Petitioner's above *habeas* claim as presented in his Petition, the West Virginia Supreme Court determined that trial counsel's "failure to arrange for a personal examination with Dr. Granacher does not rise to the level of ineffective assistance." As stated above, the West Virginia Supreme Court reasoned that Dr. Granacher's "opinion and testimony would have been the same, and consequently, the result of the trial would have been the same." (Document No. 15-6, p. 8.)

The undersigned finds that there is no evidence that the State *habeas* Court's determination on the above claim was contrary to, or an unreasonable application of, clearly established federal law; or based on an unreasonable determination of facts. The State *habeas* Court properly applied the standards set forth in Strickland in its determination that counsel was not ineffective. Decisions concerning what motions should be filed are questions of strategy for trial counsel. An attorney's strategic decision is presumed reasonable and protected from second guessing under Strickland. Furthermore, Petitioner has failed to present any evidence indicating that he was prejudiced by

29

counsel's failure to file a motion for extension of time for an examination by Dr. Granacher. For the reasons stated above in Section One, the undersigned again finds that there is no indication that Petitioner was prejudiced by the lack of an examination by Dr. Granacher. Thus, the undersigned finds that Petitioner was not prejudiced by trial counsel's failure to file a motion for extension of time. Based on the foregoing, the undersigned finds that the State *habeas* Court's determination on the above claim was not contrary to, or an unreasonable application of, clearly established federal law; or based on an unreasonable determination of the facts. Accordingly, the undersigned respectfully recommends that Respondent's Motion for Summary Judgment be granted as to Petitioner's above claim of ineffective assistance of counsel.

### C.  Evidence of Diminished Capacity:

In his Petition, Petitioner argues that counsel was ineffective in failing "to put on exculpatory evidence to prove that the petitioner has a disability which precludes him from being able to form intent." (Document No. 1, p. 9.)

In his Motion for Summary Judgment, Respondent argues that "counsel did not fail to put on evidence of diminished capacity." (Document No. 16, p. 15.) Respondent contends that "Petitioner's counsel put on Dr. Solomon and Dr. Granacher, among others, to introduce the concept of diminished capacity." (Id.) Respondent further notes that "the Court gave a jury instruction on the doctrine of diminished capacity." (Id.) Respondent asserts that "[j]ust because the jury did not accept the Petitioner's argument does not mean that the Petitioner's counsel erred." (Id.)

In Response, Petitioner concludes that trial counsel was ineffective in failing "to put on exculpatory evidence to negate intent." (Document No. 22, p. 5.) Petitioner, however, acknowledges that Dr. Solomon testified that "Petitioner indeed had a diminished capacity to

premediate or act with malice." (<u>Id.</u>, p. 22.) Petitioner, however, argues that trial counsel should have obtained Dr. Daniel G. Amen "due to his experience and expertise in the area of brain function." (<u>Id.</u>, pp. 9 – 11.) Petitioner states that Dr. Amen "compares the differences in normal x-rays, CAT scans, MRI scans, and SPECT scans." (<u>Id.</u>) Petitioner alleges that "SPECT imaging may be an adjunctive diagnostic tool that can give more information than previously available." (<u>Id.</u>)

First, a thorough review of the record reveals that Petitioner's ineffective assistance of counsel claim based upon counsel's alleged failure to present a diminished capacity defense, is an unexhausted claim. Although Petitioner asserted a claim of ineffective assistance of counsel to the West Virginia Supreme Court, exhaustion requires that a claim be "fairly presented." "A claim is fairly presented when the petitioner presented to the state courts the substance of his federal habeas corpus claim. The ground relied upon must be presented face-up and squarely; the federal question must be plainly defined." <u>Matthews v. Evatt</u>, 105 F.3d 907, 911 (4th Cir. 1997), *abrogation on other grounds recognized*, <u>United States v. Barnett</u>, 644 F.3d 192 (4th Cir. 2011). Petitioner must provide the state court with the facts supporting the claimed constitutional violation and "explain how those alleged events establish a violation of his constitutional rights." <u>Mallory v. Smith</u>, 27 F.3d 991, 994 (4th Cir. 1994). In the instant case, a review of the record reveals that Petitioner never presented to the West Virginia Supreme Court an ineffective assistance of counsel claim based upon counsel's alleged failure to present evidence of diminished capacity. Petitioner merely argued to the West Virginia Supreme Court that "counsel erred by not having petitioner personally examined by his retained expert, Dr. Granacher." (Document No. 15-6.) Therefore, the undersigned finds that the Petitioner's above ineffective assistance of counsel claim is unexhausted. Nevertheless, a claim that has not been presented to the state's highest court "may

be treated as exhausted if it is clear that the claim would be procedurally barred under state law if the petitioner attempted to present it to the state court." Baker v. Corcoran, 220 F.3d 276, 288 (4th Cir. 2000)(citing Gray v. Netherland, 518 U.S. 152, 161, 116 S.Ct. 2074, 2081, 135 l.Ed.2d 457 (1996)); also see Coleman v. Thompson, 501 U.S. 722, 732, 111 S.Ct. 2546, 2555, 115 L.Ed.2d 640 (1991)("A habeas petitioner who has defaulted his federal claims in state court meets the technical requirements for exhaustion; there are no state remedies any longer 'available' to him.") Although such claims are technically exhausted, the procedural default doctrine applies to those claims in a subsequent Section 2254 proceeding. See Clagett v. Angelone, 209 F.3d 370, 378 (4th Cir. 2000)("If claims were not exhausted in state court but would now be procedurally barred if brought in state court, then federal courts can treat the claims as if they were procedurally defaulted in the state courts.") The procedural default doctrine prevents a federal court from hearing a claim that has been, or would be, disposed of on "adequate and independent state-law grounds, unless the petitioner can show cause and prejudice for, or a fundamental miscarriage of justice resulting from, failure to comply with the applicable rule." See Bostick v. Stevenson, 589 F.3d 160, 164 (4th Cir. 2009). West Virginia Code § 53-4A-1(c) creates a rebuttable presumption that a state *habeas* petitioner knowingly and intelligently waives any claim that could have been, but was not, presented during the state *habeas* proceedings. Thus, the foregoing procedural bar "provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal *habeas corpus* review of the default claim, unless the petitioner can demonstrate cause and prejudice of the default.'" See Hayes v. Plumley, 2016 WL 5662037, * 4 (S.D.W.Va. Sep. 30, 2016)(citing Coleman, 501 U.S. at 732, 111 S.Ct. at 2555); also see Green v. Ballard, 2015 WL 1612198, * 5 (S.D.W.Va. April 10, 2015)(recognizing that W.Va. Code § 53-4A-1(c) is "an adequate and independent state ground" for purposes of procedural default). The Fourth Circuit

has recognized that "procedural default is excusable under the cause and prejudice standard when the petitioner demonstrates (1) that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule, and (2) that errors at his trial . . . worked to his *actual* and substantial disadvantage, infecting his entire trial with errors of constitutional dimensions." Wolfe v. Johnson, 565 F.3d 140, 158, n. 27 (4th Cir. 2009)(internal citations omitted). Although a claim appears to be procedurally defaulted, the court should forego further consideration of the procedural default issue if the court "can more easily dispense with the claim on its merits." Hayes, 2016 WL 5662037 at *4(citing Yeatts v. Angelone, 166 F.3d 255, 261 (4th Cir. 1999)).

    In the instant case, it appears that Petitioner procedurally defaulted his above claim of ineffective assistance of claim. The undersigned, however, will forego further consideration of the procedural default issue and address the merits of Petitioner's claim. The undersigned finds that the record does not support Petitioner's claim that trial counsel failed to put on evidence of diminished capacity. The record reveals that trial counsel presented testimony from three experts (Dr. Hughes, Dr. Solomon, and Dr. Granacher), all of whom testified that Petitioner suffered from a diminished capacity at the time of the shooting. First, Dr. Hughes testified that Petitioner had a diminished capacity to premeditate and form malice at the time of the shooting. (Document No. 15-3, p. 54.) Dr. Hughes explained that people with frontal lobe injures "act impulsively without thinking about intent or malice and then later feel remorse when they have time to think about it." (Id., pp. 55.) Second, Dr. Solomon testified that Petitioner "suffered from a diminished capacity at the time of offense that precluded him from forming an intent and premediating the act at - - the act that occurred at the time." (Id., p. 77.) Dr. Solomon stated that in his opinion, "this is one of the strongest cases of diminished capacity [he] had seen in [his] 20-some years of forensic

practice." (Id., pp. 81 – 82.) Finally, Dr. Granacher testified that Petitioner did not premeditate or act with malice at the time of the shooting. (Id., p. 114.) Dr. Granacher explained that Petitioner had frontal lobe damage, which affects how fast a person can "respond in order to think through or plan." (Id., p. 115.) Dr. Granacher stated that he believed the shooting "was an impulsive act, not a malicious act." (Id., p. 119.) Dr. Granacher explained that given the circumstances and the lack of time surrounding the shooting, Petitioner had a diminished capacity to premeditate and act with malice. (Id., pp. 122 - 123.) Accordingly, the record clearly reveals that trial counsel introduced evidence of Petitioner's diminished capacity. To the extent Petitioner contends that trial counsel was ineffective in failing to obtain Dr. Amen as an expert witness, the undersigned find such a conclusory claim to be without merit. Petitioner fails to present any evidence that an examination by Dr. Amen would have resulted in a different outcome. Petitioner merely speculates that an examination by Dr. Amen would have revealed that Petitioner had a diminished capacity and that the jury would have found Dr. Amen's testimony to be credible. Based upon the foregoing, the undersigned finds that counsel's representation did not fall below an objective standard of reasonableness, and there is no reasonable probability that, but for counsel's alleged error, the results of the proceeding would have been different. Accordingly, the undersigned respectfully recommends that Respondent's Motion for Summary Judgment be granted as to Petitioner's above claim of ineffective assistance of counsel.

### D.  Jury Instructions:

In his Petition, Petitioner argues that counsel was ineffective in failing "to object to the jury instruction as to intent as the point of the issue of mental disability of the Petitioner is that the Petitioner cannot form intent." (Document No. 1, p. 9.) Petitioner further argues that "counsel

failed to effectively protect the Petitioner's rights in jury instruction whereby the Court mislead the jury as to reasonable doubt." (Id., p. 10.)

In his Motion for Summary Judgment, Respondent first argues that "counsel did not object to the instruction on intent because it was a correct statement of the law." (Document No. 16, p. 15.) Respondent states that "[i]t cannot be ineffective assistance for counsel to allow the Court to correctly instruct the jury." (Id.) Second, Respondent asserts that "counsel similarly was not required to object to the Court's instruction on reasonable doubt." (Id., pp. 15 – 16.) Respondent contends that "the Court's instruction on reasonable doubt, passes muster and the failure to object to it cannot be considered ineffective assistance of counsel." (Id., p. 16.)

In Response, Petitioner continues to conclude that counsel was ineffective in failing "to object to definitions of 'intent' and 'reasonable doubt.'" (Document No. 22, p. 5.)

A thorough review of the record reveals that Petitioner's ineffective assistance of counsel claim based upon counsel's alleged failure to object to the jury instruction regarding the definition of "intent" and "reasonable doubt," are unexhausted. Although Petitioner asserted a claim to the West Virginia Supreme Court that the trial court erred in instructing the jury regarding "intent" and "reasonable doubt," Petitioner did not assert an ineffectiveness claim on the foregoing. (Document Nos. 15-5 and 15-6.) As stated above, exhaustion requires that a claim be "fairly presented." "A claim is fairly presented when the petitioner presented to the state courts the substance of his federal habeas corpus claim. Petitioner must provide the state court with the facts supporting the claimed constitutional violation and "explain how those alleged events establish a violation of his constitutional rights." See Mallory, 27 F.3d at 994. In the instant case, a review of the record reveals that Petitioner never presented to the West Virginia Supreme Court his ineffective assistance of counsel claim based upon counsel's alleged failure to object to the jury

35

instructions regarding the definition of "intent" and "reasonable doubt." Thus, the undersigned finds that the Petitioner's above ineffective assistance of counsel claim is unexhausted. As explained above, however, a claim that has not been presented to the state's highest court "may be treated as exhausted if it is clear that the claim would be procedurally barred under state law if the petitioner attempted to present it to the state court." See Baker, 220 F.3d at 288(citation omitted). Although it appears that Petitioner procedurally defaulted his above claim of ineffective assistance of counsel, the undersigned will forego further consideration of the procedural default issue and address the merits of Petitioner's claim.

Based upon a review of the record, the undersigned finds that Petitioner's above ineffective assistance of counsel claim is without merit. First, Petitioner fails to establish how trial counsel's failure to object to the jury instructions regarding intent and reasonable doubt fell below an objective standard of reasonableness. In Section Three below, the undersigned considers and determines that Petitioner's claim of improper jury instructions concerning intent and reasonable doubt to be without merit. Accordingly, trial counsel did not act unreasonable in failing to object to such jury instructions. Second, Petitioner fails to establish that there is a reasonable probability that, but for counsel's alleged failure to object to the jury instructions, the results of the proceeding would have been different. Accordingly, the undersigned finds that the Petitioner's above ineffective assistance of counsel claim should be dismissed.

**E.  Protection from Cross-Examination:**

In his Petition, Petitioner argues that "counsel failed to effectively protect the Petitioner during cross-examination by the prosecution." (Document No. 1, p. 10.)

In his Motion for Summary Judgment, Respondent argues that "counsel did not fail to protect the Petitioner from cross-examination." (Document No. 16, p. 16.) Respondent contends

36

that the prosecution properly cross-examined Dr. Granacher. (Id.) Respondent explains that "the prosecution limited its questioning to the reports that Dr. Granacher had prepared months before trial; the State never asked about anything that Dr. Granacher would have needed to interview the Petitioner about." (Id.) Respondent contends that "[i]t cannot be a failure to protect the Petitioner when the questions asked were all permissible based upon the reports the doctor had filed months earlier." (Id.)

In Response, Petitioner continues to conclude that trial counsel was ineffective in allowing "improper cross-examination of a defense witness." (Document No. 22, p. 5.)

A thorough review of the record reveals that Petitioner's ineffective assistance of counsel claims based upon counsel's alleged failure to protect a defense witness from cross-examination is unexhausted. Although Petitioner asserted a claim to the West Virginia Supreme Court that the trial court violated Petitioner's right to a fair trial by allowing improper cross-examination of Dr. Granacher, Petitioner did not assert an ineffectiveness claim based upon the foregoing. (Document Nos. 15-5 and 15-6.) As stated above, exhaustion requires that a claim be "fairly presented." Petitioner must provide the state court with the facts supporting the claimed constitutional violation and "explain how those alleged events establish a violation of his constitutional rights." See Mallory, 27 F.3d at 994. In the instant case, a review of the record reveals that Petitioner never presented to the West Virginia Supreme Court his ineffective assistance of counsel claim based upon counsel's alleged failure to protect Dr. Granacher from improper cross-examination. The undersigned, therefore, finds that the Petitioner's above ineffective assistance of counsel claim is unexhausted. As explained above, however, a claim that has not been presented to the state's highest court "may be treated as exhausted if it is clear that the claim would be procedurally barred under state law if the petitioner attempted to present it to the state court." See Baker, 220 F.3d at

288(citation omitted). Although it appears that Petitioner procedurally defaulted his above claim of ineffective assistance of counsel, the undersigned will forego further consideration of the procedural default issue and address the merits of Petitioner's claim.

Based upon a review of the record, the undersigned finds Petitioner's above claim of ineffective assistance of counsel to be without merit. The undersigned first notes that Petitioner fails to present any evidence establishing how trial counsel's representation fell below an objective standard of reasonableness. Petitioner merely asserts conclusory arguments that "counsel failed to effectively protect the Petitioner during cross-examination by the prosecution" and allowed "improper cross-examination of a defense witness." A review of the trial transcripts, however, does not reveal any improper questioning of Petitioner or the defense witnesses. (Document No. 15-2, pp. 198 – 203 and Document No. 15-3, pp. 1 – 163.) Furthermore, Petitioner fails to establish that there is a reasonable probability that, but for counsel's alleged errors, the results of the proceeding would have been different. Specifically, there is no indication that if trial counsel would have objected to alleged improper questioning of Petitioner or a defense witness, that the results of the proceeding would have been different. Accordingly, the undersigned finds that the Petitioner's above ineffective assistance of counsel claim should be dismissed.

**F.  Unconstitutional Decisions by the Trial Court:**

In his Petition, Petitioner argues that "counsel failed to protect the Petitioner from prejudicial and unconstitutional decisions by the Court on evidentiary issues." (Document No. 1, p. 10.) In his Motion for Summary Judgment, Respondent contends that "counsel did not fail to protect the Petitioner from unconstitutional decisions by the Court." (Document No. 16, pp. 16 – 17.) Respondent argues that "[w]ithout more information, the Respondent is left to conjecture

about what this alleged error refers to." (Id.) Petitioner does not address the foregoing issue in his Response. (Document No. 22.)

 *Habeas* petitions must meet heightened pleading requirements. McFarland v. Scott, 512 U.S. 849, 114 S.Ct. 2568, 129 L.Ed.2d 66 (1994). The petition must "set forth in summary form the facts supporting each of the grounds thus specified." Rule 2(c) of the Rules Governing Section 2254 Proceedings in the United States District Courts. "[N]otice pleading is not sufficient [in federal *habeas corpus*], for the petition is expected to state facts that point to a 'real possibility of constitutional error.'" Blackledge v. Allison, 431 U.S. 63, 75 n. 7, 97 S.Ct. 1621, 52 L.Ed.2d 136 (1977); also see Bernier v. Moore, 441 F.2d 395, 396 (1st Cir. 1971)(stating that "[t]he fundamental purpose of *habeas corpus* would be undermined if the writ were prostituted by holding it out as available upon mere 'notice' without any showing of entitlement.") The petitioner must come forward with evidence that the claim has merit. Nickerson v. Lee, 971 F.2d 1125 (4th Cir. 1992), cert. denied, 507 U.S. 923, 113 S.Ct. 1289, 122 L.Ed.2d 681 (1993), *abrogation on other grounds recognized*, Yeatts v. Angelone, 166 F.3d 255 (4th Cir. 1999). Unsupported, conclusory allegations do not entitle a petitioner to relief. See Beasley v. Holland, 649 F.Supp. 561, 566(S.D.W.Va. Dec. 2, 1986)(finding that "[m]ere conclusory charges of perjury and the knowing use of perjured testimony is insufficient to warrant a hearing or habeas relief"); Jones v. Gomez, 66 F.3d 199, 204 – 05 (9th Cir. 1995)(stating that "[c]onclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief"). The undersigned finds that Petitioner above claim is improperly pled. Petitioner merely concludes that "counsel failed to protect the Petitioner from prejudicial and unconstitutional decisions by the Court on evidentiary issues." Petitioner fails to set forth any explanation or analysis as to how trial counsel failed to protect Petitioner. Additionally, Petitioner fails to set forth any facts explaining what he considers to be "prejudicial

and unconstitutional decisions by the Court on evidentiary issues." Therefore, the above claim of should be dismissed.

### 3.   <u>**Improper Jury Instructions**</u>:

In his Petition, Petitioner argues that the trial court erred in its jury instructions. (Document No. 1, pp. 11 – 12.) First, Petitioner argues that "the jury instruction pertaining to 'intent' violated the Petitioner's right to a fair trial and to due process of law." (<u>Id.</u>, p. 11.) Petitioner states that he "has a mental disability in which the petitioner cannot form intent, a vital element of 1st degree murder." (<u>Id.</u>, p. 12.) Second, Petitioner claims that "the jury instruction pertaining 'reasonable doubt' impermissibly shifted the burden of proof to the defendant which violated the Petitioner's right to a fair trial and to due process of law." (<u>Id.</u>) Finally, Petitioner asserts that "the jury instruction pertaining to differentiating between circumstantial and direct evidence violates the petitioner's right to a fair trial and to due process of law." (<u>Id.</u>)

In his Motion for Summary Judgment, Respondent argues that there were no errors in the jury instructions. (Document No. 16, pp. 15, 16, 18.) First, Respondent argues that the instruction on intent "was a correct statement of the law." (Document No. 16, p. 15.) Respondent states that the trial court's instruction that the jury could infer that a person intended all of the natural consequences of his actions was a correct statement of the law that does not amount to burden shifting. (<u>Id.</u>) Respondent explains that the "jury in this case was permitted, but not required, to make such an inference." (<u>Id.</u>) Second, Respondent asserts that "the Court's instruction on reasonable doubt passes muster." (<u>Id.</u>, p. 16.) Respondent explains that "the Court gave the standard jury instruction approved in <u>State v. Goff</u>, 166 W.Va. 47, 272 S.E.2d 457 (1980)." (<u>Id.</u>) Finally, Respondent argues that "[t]he instructions regarding circumstantial and direct evidence were proper." (<u>Id.</u>, p. 18.) Respondent explains that "[t]he instructions noted that there was but one

40

burden of proof, that is beyond a reasonable doubt." (Id.) Respondent stated that "the instructions noted that in West Virginia, circumstantial and direct evidence possess the same probative value." (Id.) Additionally, the instructions provided that "[t]he jury is not required to differentiate between the types of evidence, it is required to weigh all the evidence, and determine that all of the evidence provides proof beyond a reasonable doubt of every material element of an offense." (Id.) Respondent, therefore, concludes that "as a whole, the instructions were proper and correct statements of the law." (Id.) Petitioner failed to address the above issues in his Response. (Document No. 22.)

> Regarding Petitioner's above *habeas* claim, the Circuit Court found as follows:
>
> > Joseph objects to the trial court's instruction to the jury on the statutory element of "intent":
> >
> > \* \* \*
> >
> > Habeas counsel argues that the jury instruction in the present case runs afoul of the holding of the United States Supreme Court in *Sandstorm v. Montana*, 442 U.S. 510 (1979). In *Sandstrom*, the trial court instructed the jury that "the law presumes that a person intends the ordinary consequences of his voluntary acts."[7]

---

[7] In *Sandstrom v. Montana*, the United States Supreme Court held that a jury instruction creating a presumption of malice that had the effect of either eliminating intent as an issue, or of shifting the burden of proof as to defendant's intent, violated due process. *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1999). Subsequently, the Supreme Court explained that the threshold inquiry in ascertaining the constitutional analysis applicable to this kind of jury instruction is to determine whether the instruction created a mandatory presumption or merely a permissive inference. *Francis v. Franklin*, 471 U.S. 307, 313-14, 105 S.Ct. 1965, 1971, 85 L.Ed.2d 344 (1985)(citations omitted). A mandatory presumption instruction "instructs the jury that it must infer the presumed fact is the State proves certain predicate facts." *Id.* A permissive inference instruction "suggests to the jury a possible conclusion to be drawn if the State proves predicate facts, but does not require the jury to draw that conclusion." *Id.* "A permissive inference does not relieve the State of its burden of persuasion because it still requires the State to convince the jury that the suggested conclusion should be inferred based on the predicate facts proved." *Id.* A mandatory presumption instruction violates the Due Process Clause if the instruction relieves the State of the burden of persuasion on an element of an offense. *Id.* A permissive inference instruction does not necessarily implicate the concerns of *Sandstrom* because "[a] permissive inference does not relieve the State of its burden of persuasion." *Id.* "A permissive inference violates the Due Process Clause only if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury." *Id.*(citation omitted).

In the instant case, the challenged instruction states as follows:

> It is reasonable to infer that a person ordinarily intends to do that which he does or which it the nature or probable consequence of his knowing acts. The jury may draw the inference

The Court finds that the jury instruction in the present case was proper since, like the instruction in *Arthur*, it was neither couched in mandatory terms nor shifted the burden of proof to the defendant. Further, the instructions must be considered as a whole, and the instructions clearly showed that the burden was on the State to prove intent. The jury was permitted but not required, to find, based upon the evidence, Joseph's intent, the jury was properly and adequately advised of the State's duty to prove "intent" beyond a reasonable doubt.

Joseph objects to the trial court's instruction to the jury on reasonable doubt[8] that:

that a person intended all of the consequences which one standing in like circumstances and possessing like knowledge should reasonably have expected to result from any intentional act or conscious omission. Any such inference drawn is entitled to be considered by the jury in determining whether or not the State had proved beyond a reasonable doubt the required criminal intent.

Focusing upon the challenged language, the undersigned finds that the language merely created a permissive inference. The trial court specifically instructed that "the jury may draw the inference," which is permissive – not mandatory language. The undersigned, therefore, finds that a reasonable juror would have interpreted the instructions as permitting a choice on the issue of intent rather than requiring a conclusive presumption. *See United States v. Love*, 767 F.2d 1052 (4th Cir. 1985)(finding that a jury instruction that "it is reasonable to draw the inference and find that a person ordinarily intends the natural and probable consequences of acts knowingly done or knowingly omitted" merely instructed the jury what a reasonable inference would be, and did not require the jurors to draw any inference); *Dupuy v. Cain*, 201 F.3d 582, 588 (5th Cir. 2000)(finding that an instruction that "[a]s a general rule it is reasonable to infer that a person ordinarily intends all the natural and probable consequences of acts knowingly done or knowingly omitted by him" was an allowable inference that did not create a prohibited presumption); *United v. Lord*, 711 F.2d 887, 892 (9th Cir. 1983)(finding the jury instruction that "It is ordinarily reasonable to assume that a person intends the natural and probable consequences of acts knowingly done or knowingly omitted" was not defective under *Sandstrom*). Based upon the foregoing, the undersigned finds that Petitioner's claim that "the jury instruction pertaining to 'intent' violated the petitioner's right to a fair trial and due process" is without merit.

[8] The trial court instructed as follows:

The law presumes a defendant to be innocent of crime. Thus a defendant, although accused, begins the trial with a "clean slate" with no evidence against him. And the law permits nothing but legal evidence presented before the jury to be considered in support of any charge against the accused. So the presumption of innocence alone is sufficient to acquit a defendant, unless the jurors are satisfied beyond a reasonable doubt of the defendant's guilt after careful and impartial consideration of all the evidence in the case.

It is not required that the government proves guilt beyond all possible doubt. The test is one of reasonable doubt. A reasonable doubt is a doubt based upon reason and common sense – the kind of doubt that would make a reasonable person hesitate to act. Proof beyond a reasonable doubt, therefore, must be proof of such a convincing character that a reasonable person would not hesitate to rely and act upon it.

* * *

Habeas counsel argued that the above instruction runs afoul of the holding by the United States Supreme Court in *Victor v. Nebraska*, 511 U.S. 1 (1994); the Fourth Circuit Court of Appeals in *United States v. Love*, 767 F.2d 1052 (4th Cir. 1985); and the West Virginia Supreme Court of Appeals in *State v. Ashcraft*, 172 W.Va. 640, 309 S.E.2d 600 (1983).

In *Victor*, the United States Supreme Court held that the United States Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course. The Court noted that as long as the jury is instructed that a defendant's guilt must be proved beyond a reasonable doubt, the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof. According to *Victor*, the constitutional question is whether there is a reasonable likelihood that the jury understood the instructions to allow a conviction based on proof sufficient to meet the standard of beyond a reasonable doubt.

In *Love*, the petitioners contended that the trial court's charge relating to the definition of reasonable doubt constituted plain error, necessitating reversal of their convictions. Specifically, the petitioners objected to the part of the trial court's charge instructing that ". . . reasonable doubt exists in any case when after a careful and impartial consideration of all the evidence, you the jury do not feel convinced to a reasonable moral certainty that a defendant is guilty of the charges." The petitioners all challenged language in the instruction that ". . . proof beyond a reasonable doubt is established if the evidence is such as you would be willing to rely and act upon in the more important affairs of your own life." Although the Fourth Circuit Court of Appeals noted that it has repeatedly joined in the general condemnation of a trial court's attempt to define reasonable doubt in its jury instructions, it concluded that the instructions given in *Love* were not plain error, which would require reversal of the petitioners' convictions.

In *Ashcraft*, the West Virginia Supreme Court of Appeals discouraged the use of instructions which attempt to define reasonable doubt beyond the standard charge. In *State v. Goff*, 166 W.Va. 47, 272 S.E.2d 457 (1980) the trial court offered, and the West Virginia Supreme Court upheld, a standard instruction on the presumption of innocence and burden of proof. Like *Goff*, the instruction in the

---

The jury will remember that a defendant is never to be convicted on mere suspicion or conjecture.

The burden is always upon the prosecution to prove guilt beyond a reasonable doubt. This burden never shifts to a defendant; for the law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence. So if the jury, after careful and impartial consideration of all the evidence in the case, has a reasonable doubt that a defendant is guilty of the charge, it must acquit. If the jury views the evidence in the case as reasonably permitting either of two conclusions – one innocence, the other of guilt – the jury should of course adopt the conclusion of innocence.

The undersigned finds no merit in Petitioner's conclusory claim that the foregoing instruction "impermissibly shifted the burden of proof to the defense."

present case was a standard instruction. The Court finds that the instruction, when considered in the context of the charge as a whole, correctly conveyed the concept of reasonable doubt. The Court concludes that it was not misleading, confusing, nor improper.

Additionally, counsel contends that the jury instruction in the present case regarding direct and circumstantial evidence runs afoul of the holding by the Fourth Circuit Court of Appeals in *United States v. Gray*, 137 F.3d 765 (4th Cir. 1998), and the West Virginia Supreme Court of Appeals in *Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995). In *Guthrie*, the West Virginia Supreme Court overturned the long established rule that when the State relies upon circumstantial evidence, in whole or in part, a court, in order to sustain a guilty verdict, all other reasonable hypotheses must be excluded by the prosecution save that of guilt. In doing so, the Supreme Court recognized that circumstantial evidence and direct evidence inherently possess the same probative value and are indistinguishable so far as the jury's fact-finding function is concerned. The jury is required to weigh all of the evidence, both direct and circumstantial, against the standard of proof beyond a reasonable doubt.

Based upon the findings and legal analysis set forth in the above opinions, the Court finds that the jury instruction in the present case was proper since the trial court instruction merely defined direct and circumstantial evidence, and did not include the language excised by *Gray* and *Guthrie*. The instruction simply advised the jury that the law accepts both direct and circumstantial evidence to establish the guilt of the accused, and that in some cases, circumstantial evidence is the only source of proof. The instruction did not differentiate between direct and circumstantial evidence and recognized that there should be only one standard of proof in criminal cases, that of proof beyond a reasonable doubt. Accordingly, when read as a whole, this Court concludes that the jury instructions in the instant case were proper.

(Document No. 15-5, pp. 14 - 19.) The West Virginia Supreme Court adopted and incorporated the "Circuit Court's well-reasoned findings and conclusions as to all the assignments of error raised in this appeal" and affirmed the decision of the Circuit Court. (Document No. 15-6.)

As stated above, the petitioner must come forward with evidence that the claim has merit. Nickerson, 971 F.2d at 1125. Unsupported, conclusory allegations do not entitle a petitioner to relief. See Beasley, 649 F.Supp. at 566(finding that "[m]ere conclusory charges of perjury and the knowing use of perjured testimony is insufficient to warrant a hearing or habeas relief"); Jones, 66 F.3d at 204 - 05(stating that "[c]onclusory allegations which are not supported by a statement of specific facts do want warrant habeas relief"). The undersigned finds that Petitioner's above

allegation that the trial court's jury instructions on "intent," "reasonable doubt," and "circumstantial and direct evidence" violated Petitioner's "right to a fair trial and due process" is insufficient. Petitioner merely concludes that his "right to a fair trial and due process" was violated without coming forward with evidence to support his claim. The undersigned further finds that there is no evidence that the State *habeas* Court's determination on the above claim was contrary to, or an unreasonable application of, clearly established federal law; or based on an unreasonable determination of facts. Therefore, Respondent is entitled to summary judgment on the above claim.

**4.  Insufficient Evidence:**

In his Petition, Petitioner argues that the evidence was insufficient to support his conviction of first degree murder. (Document No. 1, pp. 13 – 14.) Petitioner explains that he "has a mental disability which does not allow him to be able to form intent which is a required element of 1st degree murder." (Id., p. 14.) Petitioner states that "[t]he State had [Dr. Granacher's] report three months prior to the trial." (Id.)

In his Motion for Summary Judgment, Respondent argues that "the evidence was more than sufficient to convict the Petitioner." (Document No. 16, pp. 17 - 18.) Respondent argues that Petitioner fails to meet the heavy burden to show insufficient evidence. (Id., p. 18.) Respondent notes a review of the undisputed facts reveals sufficient evidence to support the verdict. (Id.) Respondent asserts that Petitioner does not dispute that he killed the victim, but "simply claims he lacks the capacity to form the intent to kill." (Id.) Respondent claims that Petitioner relies solely upon his claim that he "believes that the denied interview with Dr. Granacher would have somehow swayed the jury in his favor, even though his own counsel and witness testified that the proffered interview would not have changed a word of testimony." (Id.) Respondent argues that "[a] rational trier of fact could easily conclude the time spent retrieving the gun, searching for Ms. Lambert,

agitating and arguing with the victim, insulting the victim before shooting him, and driving over

the victim's body all show a pattern of intent." (Id.) Respondent, therefore, concludes that "[t]here

is certainly malice here, and the Petitioner cannot escape it by clinging to a single denied motion."

(Id.)

In Response, Petitioner argues that the "facts and testimony offered by experts pertaining

to the traumatic brain injury that Petitioner suffered showed the long term effects on his ability to

plan, organize, solve problems, conscious movement, as well as his ability to control impulsive

actions, personality, behavior and his emotions." (Document No. 22, p. 8.) Petitioner argues that

"as the result of an impulsive reaction, fueled by alcohol and drugs, the Petitioner more or less

snapped and took the life of one of his best friends." (Id.) Petitioner claims that he "did not plan to

take his friend's life and he surely did not drink and abuse drugs in order to carry out the offense."

(Id.) Petitioner asserts that "the entire incident was the direct result of his brain damage coupled

with the effects of drugs and alcohol." (Id.)

Regarding Petitioner's above *habeas* claim, the West Virginia Supreme Court found as

follows:

> Petitioner challenges the sufficiently of the evidence to support his conviction of
> first degree murder. Specifically, he contends that the record is replete with expert
> testimony refuting the State's theory of premeditation. Petitioner maintains the
> evidence demonstrated that he lacked the mental capacity to form premeditation as
> a result of his previous head injury. Respondent Warden replies that substantial
> evidence supports petitioner's conviction including the testimony of the State's
> expert witness, Dr. Smith, as well as the statements and behavior of petitioner at
> the time of the murder.
>
>            * * *
>
> Upon our review, this Court finds that the evidence was sufficient to support the
> first degree murder conviction, keeping in mind that for the purpose of this analysis,
> all the evidence must be viewed in the light most favorable to the prosecution. *Id.*
> At trial, witnesses to the murder testified that petitioner said "F**k you" to the
> victim just before he pulled the trigger five times. Petitioner backed his vehicle over
> the victim while leaving the premises. Petitioner drove to his parents' home and
> called 911. The jury heard petitioner's 911 call where he advised the 911 operator

46

that, "I just shot Scott Light at the mouth of Eight Mile Hollow. Somebody better get there before he dies. I just shot the son of a b**ch." Furthermore, on the issue of mental capacity, Dr. Smith opined that petitioner had the mental capacity to premeditate, deliberate, and act intentionally. Considering this evidence, we see no compelling reasons to disturb the jury's finding on appeal.

(Document No. 15-6.)

The undersigned finds that there is no evidence that the State *habeas* Court's determination on the above claim was contrary to, or an unreasonable application of, clearly established federal law; or based on an unreasonable determination of facts. The United States Supreme Court held that "evidence is sufficient to support a conviction whenever, 'after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" Parker v. Matthews, ___ U.S. ___, 132 S.Ct. 2148, 2153, 183 L.Ed.2d 32 (2012)(quoting Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Under this "deferential federal standard," a federal habeas court should not "unduly impinge . . . on the jury's role as factfinder." Coleman v. Johnson, ____ U.S. ____, 132 S.Ct. 2060, 2064, 182 L.Ed.2d 978 (2012). The Supreme Court explained that "*Jackson* leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors 'draw reasonable inferences from basic facts to ultimate facts." Id.(quoting Jackson, 443 U.S. at 319, 99 S.Ct. 2781)(stating that the "deferential standard" does not permit "fine-grained factual parsing.")

The record reveals that Petitioner was convicted of first degree murder. According to statute, a person is guilty of first degree murder if a person kills another willfully, maliciously, deliberately, and premeditatedly. W. Va. Code § 61-2-1 (1991). A review of the trial transcripts reveals that sufficient evidence existed for the jury to conclude that Petitioner committed first degree murder. (Document Nos. 15-1, 15-2, and 15-3.) Taken in the light most favorable to the

prosecution, the trial transcripts further reveals that any rational trier of fact could have found that Petitioner willfully, maliciously, deliberately, and premeditatedly killed the victim. The undisputed evidence reveals that Petitioner admitted that he shot the victim multiple times. (Document No. 15-2, p. 172) An audio recording of Petitioner's interview with Lieutenant Crosier was played for the jury. (Id., pp. 165- 185.) Petitioner stated that he "just got the gun and said, bam, bam, bam." (Id.) Petitioner explained that when the shot the victim, the victim "took off running behind me as I kept pulling the trigger." (Id., p. 181.) Petitioner stated that after he shot the victim he "got the hell out of there and went home and called you all." (Id., pp. 172 - 173.)

The events leading up to the shooting began with Petitioner partying with Jessica and Duane. (Id., pp. 57 – 61.) The record reveals that while partying with Jessica and Duane, Petitioner became upset when Jessica refused his sexual advances and Petitioner kicked Jessica and Duane out of his house. (Id.) As Jessica and Duane where proceeding down the road, Petitioner fired two gun shots and it was unclear whether Petitioner was shooting at them or firing the shots in the air. (Id., pp. 61 – 63.) Petitioner then drove to Jessica's grandmother's house in an effort to locate Jessica. (Id.) Petitioner found Richard, Jessica's boyfriend, at the grandmother's house. (Id., p. 85 – 87.) Petitioner persuaded Richard to join him in his search for Jessica. (Id., pp. 87 – 88.) Richard testified during the drive Petitioner stated that "If I can't have [Jessica], then nobody will" and that Petitioner stated that he had shot in the air two times. (Id., pp. 88 – 89.) Richard explained that they drove to the victim's house looking for Jessica and Petitioner became angry when the victim initially lied about Jessica's location. (Id., p. 90) Richard testified that Petitioner returned to his truck and began spinning up the victim's driveway. (Id.) Richard explained that the victim instructed Petitioner to stop spinning and Petitioner stopped in the driveway and the two had a verbal dispute. (Id.) Richard stated that he heard Petitioner say "f**k you" to the victim, the victim

48

stepped back, and Petitioner started shooting. (Id.) Richard testified that he yelled for the Petitioner

to stop and "he wouldn't quit." (Id.) Richard stated that he never witnessed any physical contact

occur during the argument. (Id.) Richard testified that "I was looking [Petitioner] right in the eyes,

and he was looking me right in the eyes, and then he started peeling backwards and ran over, like,

running over [the victim]." (Id.) The audio recording of Petitioner's subsequent call to the 911

operator reveals that Petitioner stated that he had just shot the "son-of-a-bitch" and "y'all better

get up here and get him before he dies." (Id., pp. 129 – 130.)

Dr. Hughes, Dr. Solomon, and Dr. Granacher opined that Petitioner had a diminished

capacity to premediate and act with malice at the time of the shooting due to Petitioner's frontal

lobe injury, which affected his executive function. (Document No. 15-3, pp. 54, 77, 122-123.) All

three of the above doctors, however, acknowledged that Petitioner had the capacity to premeditate

and act with malice. (Document No. 15-3, pp. 58, 85-86, 121-122.) Dr. Smith testified that

Petitioner scored above average and average on the two executive functioning tests. (Id., pp. 173

– 180.) Dr. Smith, therefore, opined that Petitioner's executive function was not effected to the

point that Petitioner could not premediate or act with malice. (Id., p. 187.) Dr. Smith explained

his conclusion as follows:

> He was angry at the victim and had argued with him, felt the victim was "smart
> aleckly," and escalated events by gunning his engine and spinning his tires. He took
> purposive action in attempting to find Jessica Martin, the object of his lustful
> desires. Jealousy had been raised due to the interaction of Jessica with Duane Lucas.
> Certainly, the alleged assault by the victim on the defendant could have triggered a
> self-defensive posture on the part of the defendant. Shooting the unarmed victim
> five times as he ran from the truck would not appear to be simple self-defense.

(Id., pp. 187 – 188.) Reviewing the evidence in the light most favorable to the prosecution, the

undersigned finds sufficient evidence existed for "*any* rational trier of fact" to find the Petitioner

willfully, maliciously, deliberately, and premeditatedly killed the victim. Thus, sufficient evidence

49

existed for any rational trier to fact to determine beyond a reasonable doubt that Petitioner was guilty of committing first degree murder. Based on the foregoing, the undersigned finds that the State *habeas* Court's determination on the above claim was not contrary to, or an unreasonable application of, clearly established federal law; or based on an unreasonable determination of the facts. The undersigned, therefore, respectfully recommends that Respondent should be granted summary judgment on the above ground.

**5.   <u>Improper Cross Examination</u>:**

In his Petition, Petitioner argues that "the trial court violated the Petitioner's right to a fair trial by allowing improper cross examination." (Document No. 1, p. 19.) Petitioner contends that the "trial court allowed the prosecutor to conduct an improper cross-examination whereby the witness was questioned as to, if his opinion would have changed, had he examined the Petitioner." (<u>Id.</u>) Petitioner contends that a "direct examination of the Petitioner had been denied by the court and the prosecution used this denial impermissibly during cross examination." (<u>Id.</u>) Petitioner states that an "examination was necessary to prove the Petitioner's claim of not being able to form intent." (<u>Id.</u>) Petitioner states that "[a]fter being denied the right to be examined by the Court, questioning a witness about his medical opinion is impermissible and plain error." (<u>Id.</u>)

In his Motion for Summary Judgment, Respondent contends "the trial court did not err in allowing cross-examination of Dr. Granacher." (Document No. 16, p. 18.) Respondent argues that all questions asked were permissible based upon the reports the doctor had prepared months before trial. (<u>Id.</u>) Respondent concludes that the prosecution did not engage in improper cross-examination of Dr. Granacher." (<u>Id.</u>)

In Response, Petitioner complains that "Dr. Granacher was cross-examined about deficiencies in his evaluations." (Document No. 22, p. 7.) Petitioner states that Dr. Granacher

"acknowledged that he did not take a complete medical history, a psychiatric mental status examination, a psychological assessment, a neurological examination or a neuropsychological assessment." (Id.)

Regarding Petitioner's above *habeas* claim, the Circuit Court found as follows:

During cross examination, Granacher admitted that he did not interview or physically exam the Petitioner prior to the issuance of his reports. He testified that he professional opinions and conclusions in the instant case were largely formed and derived from his review of the Petitioner's x-rays and various medical records, as well as the report issued by the other two experts, a psychiatrists and a psychologist. The State cross-examined Granacher as to the examinations which he had conducted at the time he issued his opinion in the reports of April 9 and May 7, 2004. (Tr. 526-559). The State had a "good-faith" basis for asking these questions because the reports were issued and the conclusions made were without Granacher conducting any tests or interviews of Joseph. Had the court allowed the expert to exam Joseph at the jail during the trial, the State's cross-examination would have been conducted in exactly the same manner. The State's questions were limited to the evaluations Granacher performed prior to issuing his opinion in the written reports. During cross examination, the State also challenged Granacher's "unequivocal" opinion, despite the fact that he did not perform any tests or interview Joseph prior to issuing his reports. That was within the scope of proper cross examination and the trial court did not abuse its discretion in permitting the same.

Joseph argued that the State was able to exploit the fact that the examination had never occurred. The Court finds that witness credibility is an issue for the jury to determine. The State was entitled to question Granacher regarding not only his professional and academic credentials, but also the methodology he utilized in forming his opinions and conclusions regarding Joseph's mental state. The exam sought by Joseph's counsel during the actual trial and before Granacher's trial testimony does not substantively change the fact that the expert did not conduct a physical exam of Joseph prior to forming his opinions and issuing a report in this matter. The State relied upon the expert's own published work on neuropsychiatric testing to establish that "an important part of determining someone's brain functioning or lack of brain functioning." The State did not act inappropriately when it intimated that Joseph's own expert had neglected to perform an examination in direct contravention of his own website, his own treatise, and professional standards. Ameliorative action was not required because the cross-examination was not baseless.

(Document No. 15-5, pp. 10 - 12.) The West Virginia Supreme Court adopted and incorporated the "Circuit Court's well-reasoned findings and conclusions as to all the assignments of error raised in this appeal" and affirmed the decision of the Circuit Court. (Document No. 15-6.)

First, the undersigned finds that there is no evidence that the State *habeas* Court's determination on the above claim was contrary to, or an unreasonable application of, clearly established federal law; or based on an unreasonable determination of facts. Based upon a thorough review of the record, the undersigned finds no indication that the State *habeas* Court's finding that the cross-examination of Dr. Granacher was appropriate to be contrary to, or an unreasonable application of, clearly established federal law. The record reveals that the prosecution appropriately questioned Dr. Granacher concerning how Dr. Granacher reached the conclusions contained in his report. Thus, it was proper for the prosecution to question Dr. Granacher regarding whether any tests or examinations were conducted on Petitioner.

Second, the undersigned finds that Petitioner's above claim is improperly plead. *Habeas* petitions must meet heightened pleading requirements. Petitioner's federal habeas Petition must "state facts that point to a 'real possibility of constitutional error.'" See Blackledge, 431 U.S. at 75 n. 7, 97 S.Ct. at 1621. Concerning his above claim, Petitioner merely concludes he is entitled to *habeas* relief because the trial court allowed improper cross-examination of Dr. Granacher. Petitioner, however, fails to set forth any analysis or explanation as how the allegedly improper cross-examination violated federal law. To the extent Petitioner is arguing that the trial court violated State law by allowing the prosecutor to cross-examine Dr. Granacher, Petitioner's claim is not cognizable in federal *habeas* corpus. Estelle, 502 U.S. at 67 - 68, 112 S.Ct. at 475 (stating that "[i]t is not the province of a federal habeas corpus court to reexamine state court determinations on state-law questions."); McNeill v. Branker, 601 F.Supp.2d 694 (E.D.N.C. Feb.

17, 2009)(Any claim by petitioner that the state court erred in denying his motion for a new trial based upon newly discovered evidence was not cognizable on federal *habeas* review.). Accordingly, the undersigned respectfully recommends that Respondent's Motion for Summary Judgment be granted.

## 6.  <u>Cumulative Errors</u>:

In his Petition, Petitioner argues that "the cumulative error in the trial court proceedings deprived the Petitioner of his due process rights." (Document No. 1, p. 21.) Petitioner asserts that "[i]n considering the multiple issues, the harmful errors and the plain errors in this case, the cumulative effect is one of harmful error constituting a violation of the Petitioner's right to a fair trial and to due process of law." (<u>Id.</u>)

In his Motion for Summary Judgment, Respondent argues that "there is no error, much less cumulative error." (Document No. 16, p. 19.) Respondent states "there is simply no merit in this allegation." (<u>Id.</u>) Respondent explains that "[t]here have been no errors in this trial, and there cannot be cumulative error." (<u>Id.</u>)

In Response, Petitioner argues that "[e]ven in the event this Honor Court does not see fit to find in favor of the Petitioner on any one of the claims for relief he has raised, justice requires that relief be granted due to the cumulative effects on the Petitioner's trial." (Document No. 22, p. 5.)

Regarding Petitioner's above *habeas* claim, the Circuit Court found as follows:

Finally, counsel argues that the cumulative effect of the numerous errors cited herein rises to the level requiring the reversal of the Petitioner's conviction. "Under our law, [w]here the record of a criminal trial shows that the cumulative effect of numerous errors committed during the trial prevented the defendant from receiving a fair trial, his conviction should be set aside, even though any one of such errors standing alone would be harmless error. *State v. Foster*, 221 W.Va. 629, 645, 656 S.E.2d 74, 90 (2007). However, the record before use does not show numerous errors that would warrant setting aside the Petitioner's conviction.

53

(Document No. 15-5, p. 20.) The West Virginia Supreme Court adopted and incorporated the "Circuit Court's well-reasoned findings and conclusions as to all the assignments of error raised in this appeal" and affirmed the decision of the Circuit Court. (Document No. 15-6.)

In Arnold v. Evatt, 113 F.3d 1352 (4th Cir. 1991), the Fourth Circuit Court of Appeals specifically rejected a request to cumulatively review alleged trial court errors. Id. A legitimate cumulative error analysis evaluates only the effect of matters actually determined to be constitutional error, not the cumulative effect of all alleged errors. See Fisher v. Angelone, 163 F.3d 835 (4th Cir. 1998); United States v. Russell, 34 Fed.Appx. 927 (4th Cir. 2002)(unpublished). The undersigned first notes that Petitioner's foregoing claims were rejected by the West Virginia Supreme when considered individually and cumulatively. (Document Nos. 15-5 and 15-6.) Regarding the remaining cumulative error claims, Petitioner has failed to establish that any of the claims individually constitute constitutional error. The undersigned has otherwise not found any error in the conduct of the trial of constitutional magnitude as Petitioner claims. Accordingly, the undersigned finds that there is no error to cumulate in this case. Based on the foregoing, the undersigned finds that the State *habeas* Court's determination on the above claim was not contrary to, or an unreasonable application of, clearly established federal law; or based on an unreasonable determination of the facts. Therefore, the undersigned respectfully recommends that Respondent's Motion for Summary Judgment be granted.

## **PROPOSAL AND RECOMMENDATION**

The undersigned therefore hereby respectfully **PROPOSES** that the District Court confirm and accept the foregoing findings and **RECOMMENDS** that the District Court **GRANT** Respondent's Motion for Summary Judgment (Document No. 15), **DISMISS** Petitioner's Petition Under 28 U.S.C. § 2254 for Writ of *Habeas Corpus* By a Person in State Custody (Document No.

54

1), and remove this matter from the Court's docket.

The parties are hereby notified that this "Amended Proposed Findings and Recommendation" is hereby **FILED**, and a copy will be submitted to the Honorable United States District Judge Thomas E. Johnston. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rule 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have seventeen days (fourteen days, filing of objections and three days, mailing/service) from the date of filing of this Amended Proposed Findings and Recommendation within which to file with the Clerk of this Court specific written objections identifying the portions of the Findings and Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted for good cause.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155, 106 S.Ct. 466, 475, 88 L.Ed.2d 435 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.) cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984). Copies of such objections shall be served on opposing parties, Judge Johnston, and this Magistrate Judge.

The Clerk of this Court is directed to file this "Amended Proposed Findings and Recommendation" and to mail a copy of the same Petitioner, who is acting *pro se*, and to counsel of record.

ENTERED: October 11, 2016.

Omar J. Aboulhosn
United States Magistrate Judge

55